# The Tenth National Bank of Philadelphia *v.* The Smith Construction Company.

*Corporations—Receiver—Receiver's account—Auditor's report—Surcharge—Fraud—Fraud of officers—Apparent assets—Surcharge of receiver for creditor's counsel fee—Costs.*

1. Where in the report of an auditor on a long and complicated receiver's account, the auditor surcharges the receiver in large sums, restates the account, refers specifically to evidence in support of the various items contained therein, and in addition devotes sixteen printed pages of his report to a satisfying demonstration of the reasonable possibility of arriving at a correct accounting under the proofs before him, despite the absence of certain books and papers, it is error for the court to set aside the auditor's report and hold that it is impossible to restate the account by reason of the absence of such documentary evidence, without referring to any positive testimony or pointing out the absence of proofs that reasonably refute the position of the auditor in this respect.

2. Three officers of a corporation, a construction company, formed a partnership for the ostensible purpose of furnishing and caring for the housing, etc., of laborers employed by the construction company, and received the privilege of supplying board,

food and stores to such laborers. The partnership in turn sublet its privilege to Italian padrones, who paid a percentage of their profits to the partnership in return therefor. The partnership also hired horses to the construction company and sold coal to it, from both of which operations the partnership made a profit. One of the partners was appointed receiver of the construction company. After the appointment of the receiver, the arrangement was discontinued, but the receiver paid the amount claimed to be due the partnership at the time of his appointment, and failed to recover or to make any effort to recover profits which had been realized by the partnership through its relations with the construction company. The court below reversed in part the decision of the auditor and surcharged the receiver on account of his failure to recover from the partnership profits which it had so made, also with the sum paid to the partnership after his appointment. *Held,* no error.

3. In such a case where the officers of a corporation have made and retained profits for themselves through the formation of outside agencies controlled by them, which profits they could have saved to their constituent company had their thought been only for its welfare, the law looks not at the mere form of the device employed but pierces through the surface and seizes upon the evils which lie within. While, under such circumstances, the proofs may not justify the inference as a matter of fact that such officers knew that they were doing an unlawful thing or intended a fraud against their trust as officers of the corporation, yet, where men have created artificial conditions which present inevitable temptations and opportunities for wrong, a situation arises which in law implies a fraud.

4. A receiver is not only chargeable with moneys actually received by him, but is equally chargeable and will be surcharged where moneys are due to the estate which are collectible but which have not been collected or attempted to be collected by him; and where it is contended that such apparent assets had been exhausted before the accountant's appointment, this fact should be proved where possible by production of the proper legal vouchers such as the cancelled checks or at least the stubs of the checks used.

5. In such a case, while no violent inferences should be drawn against the receiver, still where the proofs establish much dishonest conduct on his part he is not entitled to assumptions in his favor.

6. Within five weeks prior to the appointment of the president of a corporation as its receiver, $10,000 was deposited by such corporation in a certain bank. At the audit of the receiver's account, the accountant failed to produce documentary evidence to show what had become of this apparent asset. The auditor made no

surcharge for the amount, stating that it was quite plain that the money was used for the company's pay roll, but made no direct finding that the money was so used. The court reversed and decreed that in the absence of any evidence explanatory of his failure to collect this sum the accountant was chargeable therewith. *Held,* no error.

7. In such case, where a bank, one of the creditors of the corporation, claims an allowance as a fee for counsel who represented such bank, for services rendered by an expert accountant, and other amounts for money paid to cover other expenses in connection with efforts pursued by such creditor for the recovery of assets which enlarged the general fund for distribution, and the auditor found that a number of the surcharges imposed by him represented items added to the funds through the efforts of this creditor and its counsel, and as a result of a considerable expenditure of money on its part, such item is a proper charge against the estate and as it was made necessary by breaches of duty on the part of the receiver he should be surcharged for an amount equal to such item.

8. In such a case, where the conduct of the accountant in the management of his trust was largely responsible for the complexity and consequent costliness of the audit a large proportion of the expense, and a part of the auditor's fee should be assessed against him.

9. In such a case where the accountant claims credit for fees paid to counsel, and such credit is allowed by the auditor, no question of the reasonableness or propriety of the fee being raised before the auditor or upon exceptions, and where it is certain counsel rendered services which would have been required under a proper administration of the trust, the accountant should not be surcharged with the amount of the fees by the court, without affording counsel an opportunity to present proofs in support of the fees paid them and to show that they were beneficial to the estate.


Argued Jan. 6, 1913. Appeals, Nos. 324 and 70, Jan. T., 1913, by William R. Richards individually and as Receiver of the Smith Construction Company, and by the United States Fidelity & Guaranty Company, from decree of C. P. No. 5, Philadelphia Co., December T., 1904, No. 3159, in Equity, sustaining exceptions to auditor's report in the case of The Tenth National Bank of Philadelphia v. Smith Construction Company. Before FELL, C. J., BROWN, MESTREZAT, POTTER, STEWART and MOSCHZISKER, JJ. Reversed.

Exceptions to report of Thomas D. Finletter, Esq., auditor appointed to pass upon the account of William R. Richards, Receiver of the Smith Construction Company.  Before STAAKE, J.

The Tenth National Bank of Philadelphia, a creditor of the Smith Construction Company, a corporation engaged largely in the construction of railroads, filed a bill in equity for the appointment of a receiver for said company, on January 27, 1905, and on the same day, William R. Richards, president of the company, was appointed receiver.  The United States Fidelity & Guaranty Company executed the receiver's bond in the sum of $100,000.  The receiver's account was referred to the above named auditor, who surcharged the receiver in certain amounts, as appears by the opinion of the Supreme Court.  On exceptions to the auditor's report, the court below sustained certain of the exceptions and increased the amount of the surcharges.  The Guaranty Company and Richards appealed.

Further facts appear by the opinion of the Supreme Court.

*Error assigned,* among others, was the decree of the court.

*John C. Gilpin,* with him *George S. Graham* and *George Wharton Pepper,* for William R. Richards, appellant.

*G. W. Pepper,* for the United States Fidelity & Guaranty Company, appellant.

*A. G. Dickson,* with him *James McMullan,* for the Fourth Street National Bank, appellee.

OPINION BY MR. JUSTICE MOSCHZISKER, October 13, 1913:

The Smith Construction Company was a corporation

under the laws of New Jersey with a principal office in Philadelphia, engaged largely in building railroads and in public contracts. On January 27, 1905, upon the complaint of a creditor, William R. Richards, its president, was appointed receiver by the court below; he was granted permission to continue work under contracts in course of performance, in the hope that profits might be derived therefrom, but these operations proved a failure and large losses resulted. At the suggestion of a committee of creditors, appointed to supervise the conduct of the business by the receiver, the affairs of the company were wound up. The receiver filed accounts which were referred to an auditor. The action of the court below upon the report of the auditor is before us on two appeals, one by the receiver and the other by his surety; both of these appeals will be disposed of in this opinion.

The magnitude of the work involved in the audit will be appreciated when it is understood that 130 meetings were held and 1,850 printed pages of testimony taken. The auditor's report covers 530 printed pages, and in it he finds a multitude of specific facts in addition to answering many requests; he discusses the testimony, clearly states his reasons for all conclusions reached, and makes various surcharges against the receiver, amounting to $41,310.09. The court below practically set aside the entire report of the auditor and decreed that the receiver should pay $250,409.

The auditor endeavored to surcharge upon the basis of actual values, wherever he found the receiver had failed to account or had improperly accounted for assets of the estate and for all credits claimed which he conceived to be insufficiently vouched. The court below acted upon the theory that the estate was solvent when it went into the hands of the receiver, that the account was incomplete, that it had not been properly vouched, and that it was impossible to state an account with sufficient exactness. The amount the accountant was

ordered to pay was peremptorily fixed at the total of all the claims against the company and the receiver, plus counsel fees and the expenses of the audit. While the court does not directly order specific surcharges, yet in collateral justification of the amount fixed in the final decree, it briefly discusses a number of separate items which in its opinion are proper subjects for surcharge, and these aggregate more than the gross sum decreed against the receiver.

Counsel for the appellants state in their printed argument, "The court below disposed of the case upon the basis of general conclusions without making specific findings of fact and without passing specifically upon more than one of the 531 exceptions to the auditor's findings"; and this statement is substantially correct, particularly is it correct as to all the important underlying facts. The method thus pursued has added greatly to our labors on appeal; but we have examined the record and the testimony with the utmost care, and cannot concur in the general condemnation of the audit contained in the opinion of the learned court below. A detailed discussion of all aspects of the various points involved would unduly extend this opinion; our examination has satisfied us, however, that as a rule the auditor had evidence upon which to base his findings and that his conclusions were justified in most instances; later on we shall treat separately of the cases where we do not deem this to be so.

The one instance above referred to where the court below formally passed "specifically" upon a finding of the auditor, involved the financial condition of the Smith Company at the time of the receivership. The auditor found as a fact that the corporation was insolvent on January 27, 1905, when the receiver was appointed, and the evidence before him justified this finding; hence the court erred when it decided otherwise. It is true that statements were made by Richards and his counsel at that time which indicated their belief in the

solvency of the company; but such statements concerning the financial condition of hopelessly insolvent concerns are not unusual, and the auditor could not permit them to outweigh the evidence which proved insolvency.

Although the court expresses the view that an account could not be stated, yet the auditor not only found that it was possible, but actually stated one, and he refers specifically to evidence in support of the various items contained therein. In addition to the separate treatment of numerous disputed items, the auditor devoted sixteen printed pages of his report to a satisfying demonstration of the reasonable possibility of arriving at a correct accounting under the proofs before him, despite the absence of certain books and papers, and neither the court below nor the appellees refer to any positive testimony or point out the absence of proofs that reasonably refute his position in this respect.

The court below states that the auditor, instead of making the receiver sustain his account, required the creditors to establish inaccuracies therein. While certain expressions in the report, taken by themselves, might suggest this attitude, yet, when the record is viewed as a whole, it is plain that the auditor assumed no such position; on the contrary, in several important instances he surcharged the receiver or refused credits claimed by him upon the express ground that the accountant had not proved the accuracy of the item in question or that the proofs left the point in doubt. If the depositions were unduly extended, this cannot be laid at the door of the auditor. It appears that many of the receiver's papers were turned over to counsel for the creditors, and that they agreed to designate the items which they desired to dispute. In carrying out this program counsel produced testimony to attack certain items when they might have followed the simple course of calling upon the receiver to sustain them. Under the circumstances, we do not feel that the auditor can be condemned for receiving all the testimony brought be-

fore him; particularly that adduced by the creditors, whose avowed policy it was to bring as much evidence against the receiver as possible.

The record shows that the auditor not only had the aid of a great mass of testimony, but that much documentary evidence was produced, in the way of books and papers, all of which he considered in reaching the conclusion that the account had been sufficiently vouched to warrant him in passing thereon. A close study convinces us that this conclusion was right and that the court below should have dealt with the different phases of the case upon that basis; but in place of following this course, and passing separately upon the many exceptions filed to the report of the auditor, and thus pointing out wherein it thought he had erred in his facts, the court simply discusses testimony or comments on the lack of evidence or the quality of the proofs, and in most instances satisfies itself by stating conclusions differing from those of the auditor, which conclusions, as a rule, are wholly unsupported by the underlying findings of fact.

The accounts show heavy losses incurred by the receiver in carrying on the business, and probably it would have been better had there been no attempt to finish the work the Smith Company was engaged upon; that, however, was not the consensus of opinion at the time. The auditor specifically traces and explains some of these losses, but where the receiver's operations resulted in losses which could not be so traced, he refused to attribute them to the negligence or fraud of the accountant, taking the position that under the circumstances of the case there was no sufficient evidence to justify him in so doing; and in this connection he particularly calls attention to the fact that contracting for large operations is a hazardous business, and states that it is quite believable that such losses "were the result of rash or mistaken bidding by the Smith Company by whom the prices were fixed." The

adjudication of the accounts involved not only the responsibility of the receiver but the liability of his surety. The auditor recognized that the accountant had committed many reprehensible acts in the conduct of his trust, and in all instances where he conceived the evidence to show negligence or fraud in any particular transaction, he found accordingly, and made what he thought to be a proper surcharge. This was the correct way to treat the case; for even where, as here, a man has demonstrated a capacity for evil, though he may not be entitled to presumptions in his favor, yet the law does not arbitrarily presume that he is guilty of every fraud alleged against him, and since courts are restrained by principles of law, judges may not decide cases on any such line of reasoning. The learned court below assumed, apparently, that because the evidence showed the accountant capable of committing any one of the breaches of which he was accused he must be guilty of all of them. This attitude toward the case has made the work of final review exceedingly difficult; nevertheless, by what has already been written, we have endeavored, in as concise a form as possible, to state our general thoughts upon the matters before us. We shall now briefly consider each of the several surcharges suggested by the court in support of its final decree, and for this purpose we shall use the headings given in the report of the auditor and adopted on review below.

"PAY ROLLS" AND "WEST END SPECIAL ACCOUNT."

The receiver claimed a credit of $180,501.10, to cover wages paid for work upon the various operations of the Smith Company, and the auditor, after making a number of substantial reductions, allowed the greater part thereof; but the court thought the credit had not been properly vouched and decided that the entire claim should be disallowed. We cannot agree with this conclusion. While the court below expresses the opinion that the pay rolls produced by the accountant were "false and padded," yet it does not indicate any definite

falsifications therein nor make any specific findings upon the underlying relevant facts differing from those of the auditor, who, after carefully discussing and dissecting all the evidence upon the subject, found the fact to be otherwise. The point made by the court as to the nonproduction of what it calls "original data" connected with the pay rolls, is fully explained by the auditor; and the testimony of witnesses called by both sides justifies his conclusion that the destruction of such data was in accordance with uniform custom and based upon good reasons. The court states that it is clear the receiver had no personal knowledge of the pay rolls and "took no part in their preparation or in the actual payment of the amounts stated therein." This seems to be borne out by the testimony; but the auditor finds from other sufficient evidence exactly how these rolls were made up, and he shows how difficult it would be to falsify them without the actual participation of a number of men, some of whom were called as witnesses by the creditors and the character of none of whom was attacked by them.

The auditor held that the rolls were prima facie evidence of the payment of the wages therein set forth. Whether, in a strictly legal sense, this be true, it is not necessary to determine; for the auditor's conclusions do not depend upon the adoption of that theory. There can be no gainsaying the fact that the receiver had an army of men constantly at work, and the market value of the labor actually performed by these men, or the rate of wages paid to them, has not been questioned; moreover, it is apparent from the tangible results accomplished that a vast sum of money must have been paid out in wages. When we accept the finding of the auditor that the rolls were not padded,—that they present a true and correct list of the workmen engaged and the hours of labor performed,—and when we consider that, although several years elapsed between the performance of the work and the audit of the account, no wage claims

were forthcoming, excepting a few which were duly accounted for, we can safely draw the conclusion that, generally speaking, the wages set forth in the rolls were paid; and by surcharging the receiver with all returned pay envelopes, as hereinafter indicated, this conclusion is made reasonably safe to act upon. Furthermore, a large portion of the item in question was for wages which had accrued prior to the receivership and which the accountant had paid under an order of court, and in several instances paymasters were produced who testified that the wages had in fact been paid as stated in the rolls.

Of course, as the court below properly states, it would have been much better if a different system had been pursued by the receiver, so that a more exact vouching could have been had; but, after a most careful investigation of the testimony and consideration of all that has been said upon the subject, we are convinced that the auditor with painstaking care properly disposed of the issues growing out of this branch of the case, except one, which we now shall proceed to consider.

The pay rolls were made up originally on the respective operations and then sent to the home office of the company, where additional calculations were made and a pay envelope prepared for each man whose name or number appeared thereon. The rolls and the envelopes were then given to the paymasters. All envelopes not claimed on pay day or within a short time thereafter were returned to headquarters; and when they remained unclaimed for a certain length of time the cash contained therein was deposited in a special account in the West End Trust Company, Philadelphia. This course was pursued prior to the receivership and appears to have been continued thereafter. The total deposits in this account amounted to $9,430.51, but the auditor decided that the receiver was only chargeable with so much thereof as was shown to have actually come into his hands. We cannot subscribe to this view.

The attack on the reliability of the rolls as evidence of the payment of the wages therein set forth rested largely upon testimony to the effect that many of the pay envelopes remained unclaimed. Although it may be that the amount which admittedly passed into the hands of the accountant truly represents all these unclaimed wages and that the balance of the moneys which had been deposited in the account was claimed and properly paid out prior to the receivership, yet, if the receiver desired to be relieved of all liability in regard thereto, he should have produced some evidence upon the subject; and this he utterly failed to do. In this respect, at least, he was in default, for it was not only the duty of the receiver to account for all moneys which came into his hands, but also for all moneys which he was under obligation to collect.

The auditor found that the receiver was guilty of a fraudulent deception concerning this special account, and he surcharged him $3,675.95, but we feel that under all the surrounding facts the accountant should have been ordered to pay the whole $9,430.51. (For a fuller discussion of the principle upon which this surcharge rests, see "Deposit with Nat'l Ex. Bank," infra.)

### "WEST VIRGINIA ATTACHMENTS."

The auditor found that after the appointment of the receiver several persons, shown by the books of the Smith Company to be creditors in the total amount of $8,055.67, levied attachments upon its property in West Virginia. The articles attached were part of a plant which the receiver had contracted to sell to a railroad company with an agreement to pay off and discharge all liens thereon. The court below authorized this sale under an arrangement whereby a surety company was to enter its bond in order to get the property released, and to indemnify the surety against loss the purchase money was to be paid to it. Instead of carrying out this plan, the receiver settled the claims by payments amounting to $6,265.85, thereby affecting a saving of $1,789.80. The

auditor allowed a credit for the amount paid, but the court surcharged the receiver with the whole $6,265.85, principally upon the ground that the settlements were made without its authority. From the opinion filed, the court appears to doubt the validity of the attachments because the receiver was able to settle them for less than the face of the claims; but it does not find that they were not valid liens, nor does it overrule the auditor who found they were such. While the court fails to touch upon the matter, yet the appellees allege that the receiver only collected $8,668.56, instead of $12,000.00, the sum named in the petition under which the sale of the property was authorized. But an examination of the testimony shows the total of the amounts actually received to have been $9,635.37, and that the reduction was due to the fact that certain of the property scheduled for sale by the contract with the railroad company was missing and could not be delivered. We have examined all the evidence upon the subject before us, and although the receiver ought to have reported the matter back to the court below when he found the sale could not be carried out upon the exact plan stated in the authority under which he acted, yet we are not convinced of any evil intention on his part in this regard, or that any harm was done to the trust estate. On the whole, we feel that the court should have approved the report of the auditor on this branch of the case, and we now so direct.

"SETTLEMENT WITH WEST END TRUST COMPANY"
and
"J. T. RICHARDS LOAN AND STOCK LIABILITY."

The auditor found that Joseph T. Richards (an uncle of W. R. Richards) loaned a considerable sum of money to the Smith Company, when apparently it was a solvent going concern, and that he held as collateral with its notes some shares of its capital stock and an assignment of certain retained percentages due to it from the Pennsylvania Railroad Company; that the loan from

J. T. Richards to the Smith Company was made through the West End Trust Company and the assignment was taken in the name of that institution; that this was the situation when the Smith Company went into the hands of the receiver; that when the receiver attempted to collect the retained percentages from the Pennsylvania Railroad Company, amounting to $27,625.57, the latter set up the assignment and refused to make payment; that, with matters in this condition, a compromise was arranged with J. T. Richards whereby he accepted $10,-000 in full of the indebtedness to him, and the notes of the Smith Company, together with all the collateral were handed to the receiver; that the receiver forthwith collected the retained percentages from the Pennsylvania Railroad. The auditor specifically finds there was no fraud in the transaction at any time and that the arrangement saved at least $12,500 to the creditors of the Smith Company. A possible explanation of why J. T. Richards was willing to make this compromise may be found in the fact that he was an officer of both the West End Trust Company and the Pennsylvania Railroad Company at the time of his dealings with the Smith Company. Those reasons were assigned for using others as his agents in the first instance, instead of acting directly, himself; and for these same reasons, as suggested in the testimony, he may very well have desired to avoid public litigation of his claim. Despite the findings of the auditor, and without disturbing any of them, the court below determined that the receiver should have been surcharged with the $10,000 paid to effect this compromise. This decision is placed upon the ground that the Smith Company did not owe any indebtedness to the West End Trust Company, that the compromise included the release of a note for $7,500 on which W. R. Richards was liable, and that the settlement was made without leave of court. The auditor explains that the trust company was merely acting as an agent for J. T. Richards, and the findings show that

W. R. Richards was but an accommodation endorser of the $7,500 note for the benefit of the Smith Company; further, his release of liability was a mere incident of the compromise. In view of these facts and the other relevant findings, had the matter been presented to the court, there cannot be any doubt that the compromise would have been authorized; hence the auditor committed no error when he refused to surcharge the receiver.

Before leaving this branch of the case, we take occasion to state that an examination of the testimony shows warrant for all the findings and conclusions of the auditor, including those to the effect that the shares of stock delivered to "T. R. Morgan, Agent," were not held by him as an owner with a liability on his part, or on the part of his principal, J. T. Richards, as a subscriber for such stock, but were held merely as collateral for the loans made to the Smith Company by J. T. Richards.

"DUNN & CO. SALE" and "STOCK LIABILITY."

On the facts found by the auditor and not disturbed by the court below his conclusions concerning the transfer of the assets of Dunn & Co. to the Smith Company were justified; particularly that Richards was the owner by purchase from Dunn of all the assets of Dunn & Co. when he transferred them to the Smith Company, and that the price paid therefor by the latter corporation, approximately $68,000, represented a legitimate business deal between the parties. The auditor has gone into the subject of these transactions elaborately, and we shall not attempt to present them in detail. The paper books show the following important facts to be admitted: originally Richards and Dunn were the sole partners and owners of the assets of Dunn & Co.; on January 17, 1903, when the former purchased the latter's interest in Dunn & Co., Richards and one Jacobs were practically the sole owners of the Smith Company; and this was the state of affairs when the assets of Dunn & Co. were transferred by Richards to the Smith Com-

pany. The Smith Company was solvent at least down to January 30, 1904, and did not pass into the hands of the receiver until January 27, 1905. Hence, at the time of the transactions in question there were no creditors and practically no outside stockholders to be considered.

While Richards purchased Dunn's one-half interest in Dunn & Co. for a price which might be taken to indicate a value of not over $33,000, and subsequently sold all the assets of that concern to the Smith Company for a much larger sum, this does not necessarily indicate a fraud perpetrated against the latter; for the auditor has found that in connection with the tangible assets thus transferred the Smith Company acquired three contracts between Dunn & Co. and the Pennsylvania Railroad Company, which netted it over $120,000 in profits. Under all the circumstances it cannot be said justifiably that the auditor erred in treating these contracts as a species of "good will"; or that he erred in deciding that the entries in the books of the Smith Company were not conclusive of the actual transactions under investigation. It does not appear why Dunn sold his interest to Richards at such an apparently low price; but railroad construction is at best a hazardous business and he may not have anticipated the real value of the Pennsylvania Railroad contracts. Be this as it may, however, we can find no warrant for the summary reversal by the court below of all the conclusions of the auditor upon this branch of the case; and we feel that, under the findings and the relevant rules of law and practice, the learned court erred in discountenancing the credit of $68,222.10 permitted by the auditor in the personal account of W. R. Richards. In this connection, we need only add that, under the findings, the liquidation of the indebtedness of the Smith Company to Richards by the issuance of certain shares of its full paid capital stock to him, and to Jacobs and others on his order, was neither extraordinary nor wrong and could not be properly so construed.

### "PLANT NOT ACCOUNTED FOR."

The auditor found that the receiver had failed to account for various items of machinery valued at $2,-836.70, which belonged to the plant of the Smith Company at the Frenchtown operation, that a blacksmith's outfit valued at $150 was not accounted for, and that by a pretended sale for $450 the receiver had fraudulently misappropriated property to the value of $3,000 belonging to the plant at York; and he surcharged the accountant accordingly. The evidence as to the real value of the articles included in the fraudulent sale varied considerably, and after summing up all the testimony upon the subject the auditor fixed the value at $3,000. The court below without specifically or formally overruling the auditor's findings of fact raised the total represented by the three items of surcharge to $11,-821.75. The increase was worked out upon this theory: the receiver was a part owner in a concern known as the Schuylkill Stone Company; certain of the articles included in the surcharge were traced to that company, and it was also proved that its books showed a credit for machinery, etc., amounting to $11,821.75, without showing any payments therefor. After reciting these facts, the court below states, "The only way of fixing the value of the plant misappropriated by the receiver is to adopt the figures in the stone company's books." The court then proceeds to deduct the aggregate of the surcharges made by the auditor from this $11,821.75, and thus raises the total amount of such surcharges by $5,-835.05. This was error, and the auditor would have erred had he adopted any such method of valuation. While property belonging to the Smith Company was shown to have been used by the stone company, the testimony indicates clearly that these articles did not constitute the entire plant of the latter concern, and there is nothing to identify them specifically with the item of $11,821.75 in its books. The auditor's report demonstrates an exhaustive study of the proofs; he apparently

has given careful thought to the subject of the surcharges under consideration, and his conclusions relative thereto merit approval.

## "THE MARYLAND COMPANY."

The auditor found that Richards, Jacobs and Blair, all of whom were officers of the Smith Company, formed a partnership, styled the Maryland Company. The ostensible business of this concern was to furnish and care for the housing, etc., of laborers employed by the Smith Company upon its various operations, and it received the privilege of conducting the "commissaries" (the right to supply board, food and stores to these laborers). The Maryland Company, in turn, sublet its privileges to Italian padrones, and "all the work the Maryland Company did in connection therewith was this subletting." The padrones ran the "company stores" and permitted the Maryland Company a discount upon the laborers' purchases and board bills. A method of securing payment of the workmen's bills through tickets given to them by the Smith Company by means of which they made purchases, paid board bills, etc., which were subsequently charges against their wages, was inaugurated and maintained by that company; and thereunder 90 per cent. of such expenditures was paid to the padrones and 10 per cent. to the Maryland Company. This arrangement was discontinued when the receiver was appointed, but a considerable sum had been paid to the Maryland Company prior to that time, and the receiver paid the amount claimed to be due it up to the date of the discontinuance of the system. The auditor carefully considered the last-mentioned payment and surcharged the receiver $563.90; but he refused to increase this surcharge and declined several others asked by the creditors. The surcharges declined embraced a profit of $4,642.37 made by the Maryland Company through hiring horses to the Smith Company, a profit of $184.30 through the sale of coal by the former to the latter, and,

finally, a profit of $4,540.61 covering the 10 per cent. on the commissaries. The court below decided that all these surcharges should have been allowed, and we agree with this conclusion.

The auditor's views in reference to the matters before us present a degree of apparent reasonable justification, and they merit fuller discussion than given by the court below or than we as a court of appeal can afford them, but after consideration we feel that, on the facts as found by him, the 10 per cent. paid to the Maryland concern might have been saved to the Smith Company,—in substance it was nothing more or less than a commission for services that could have been performed directly by the officers of that company. Again, if the Maryland Company could furnish coal and horses to the Smith Company at a profit, it has not been made plain why the men who constituted that concern did not perform this service directly as officers of the latter corporation, and thus save to it the amount of such profits. Cases may be cited where the officers of a corporation have been permitted to make and retain profits for themselves through the formation of outside agencies controlled by them, which profits they could have saved to their constituent company had their thought been only for its welfare; but in such instances the law has ceased to look at the mere form of the device employed, —it now pierces through the surface and seizes upon the evils which lie within. In the case before us, although, as found by the auditor, the evidence may not show an actual fraudulent purpose or scheme to "milk" the Smith Company in the inception of the Maryland Company,—that is, the proofs may not justify the inference as a matter of fact that Richards and his associates knew that they were doing an unlawful thing or intended a fraud against their trust as officers of the former company, yet where, as here, men create artificial conditions which present inevitable temptations and opportunities for wrong, a situation arises which in law

implies a fraud. We conclude that under all the circumstances, this branch of the case presents, at least, a legal fraud, and the auditor ought to have so found.

The receiver should be surcharged for his failure to collect the item of $4,642.37, the item of $184.30 and the item of $4,540.61; but he should not be surcharged, as directed by the court below, with the sum of $965.55; we feel that the auditor correctly disposed of all matters connected with this latter item when he ordered the surcharge of $563.90.

"DEPOSIT WITH NATIONAL EXCHANGE BANK OF WESTON."

It appears that some time between December 23, 1904, and January 7, 1905, $10,000 was deposited by the Smith Company in the National Exchange Bank of Weston, West Virginia. The receiver was appointed January 27, 1905. At the audit the accountant failed to produce any documentary evidence to show what had become of this apparent asset; he testified, however, that the account was exhausted before his appointment. The auditor refused to make a surcharge, stating that, "since he (the receiver) did not get it (the money in question) himself he can hardly be asked to account for it," and adding, "it seems quite plain that the money was used for the Frenchtown pay roll"; but he made no direct finding that the money was used for that purpose. The court below reversed and decreed that, in the absence of any satisfactory evidence explanatory of his failure to collect this substantial sum, the accountant was chargeable therewith. The court calls attention to the fact that the receiver was the former president of the Smith Company, and states, "A receiver is not only chargeable with moneys actually received by him but is equally chargeable and will be surcharged where moneys are due to the estate which are collectible and which have not been collected or attempted to be collected by him"; adding, "that the money was used for the West Virginia pay rolls seems to be entirely an assumption by the learned auditor, if such was the actual fact it

should have been proved by the production of the proper legal vouchers such as......the cancelled checks, or at least the stubs of the checks used."

We feel that the court below was right in its view concerning the item under consideration. Our attention has not been directed to and we find no satisfactory evidence explaining what became of this money; while no violent inferences should be drawn against the receiver, yet, since the proofs establish so much dishonest conduct on his part, he is not entitled to assumptions in his favor. The appellant states in his printed argument, that he attached to his return to a certain petition in the court below (filed after the decree from which this appeal was taken) a statement "showing deposits and checks drawn against the funds" in question, and that this paper demonstrates that the bank account was exhausted prior to his appointment as receiver. We are unable to find the document in the paper books; therefore, we cannot judge as to its value. If the court below is of opinion that the statement in question indicates the existence of proper explanatory evidence in relief of the receiver, it can, and no doubt will, deal further with the matter when this record is returned to it; on the other hand, if the court below is not so impressed, the receiver should be surcharged as already indicated by that tribunal in dealing with this branch of the case. But, of course, he should not be so surcharged if it is apparent that he can show by proper evidence that the funds were exhausted by the Smith Company prior to the receivership.

"FOURTH STREET NATIONAL BANK CLAIM."

The Fourth Street National Bank claimed an allowance of $15,207.97; $10,000 was asked as a fee for counsel who represented the bank, $4,000 for services rendered by an expert accountant, and the balance to reimburse it for money paid to cover other expenses in connection with efforts started and pursued by this particular creditor for the recovery of assets which enlarged the gen-

eral fund for distribution. The auditor found that a number of the surcharges imposed by him represented items added to the fund through the efforts of this creditor and its counsel, and as the result of considerable expenditure of money on its part; and he allowed the bank $7,500 out of the estate. He declined the balance of the claim on the ground that his other surcharges were not additions to the fund brought about by the bank. The court increased the amount allowed, and states: "The auditor, in reducing the claim to $7,500, made too large a reduction. Taking into consideration the views expressed by the auditor, and also the amount realized by the efforts of counsel, the court is of opinion that under all the circumstances a fair allowance to the claimant would be the costs and $5,000 counsel fee, a total of $10,207.97"; adding, "as this expense was caused by the fraud and deception of the receiver, it must be paid by him." The appellant contends that the allowance is too large and that the court below had no right in law to impose these counsel fees, etc., upon the receiver.

Our rulings have materially increased the fund for distribution over the amount determined by the auditor, and some of the items affected represent additions attributable to the efforts of the bank, but we have not adopted in toto the views of the court below; hence, since both the auditor and the court were guided largely in determining their respective awards by the gross sum realized through the efforts of the bank, logically, there should be an increase in the amount fixed by the former but the allowance should not be as great as the award of the latter. After weighing the matter in detail, we feel that $8,800 would be fair and equitable, and we so order.

In considering whether or not the receiver should be surcharged a sum sufficient to meet this item, we must start with the thought that it is a proper charge against the estate, for it was incurred in the creation of a part

of the fund which was before the court for distribution. Next, it was made necessary by breaches of duty on the part of the receiver; therefore, it follows that the estate has a claim against him in a like amount to make it whole. This being the case, the court below did not err when it suggested a surcharge sufficient to cover the total of the allowance to the bank. In theory these counsel fees, etc., are not imposed directly upon the receiver, qua counsel fees, etc., but a like amount is surcharged against him as a debt due to the estate, to cover expenses incurred by it through his default.

### "COUNSEL FEES."

The auditor allowed $5,150 paid by the receiver to his general attorney in Philadelphia, but disallowed a claim for an additional $5,500 to the same counsel, stating that the necessity for the services covered by this additional fee arose from the negligence and fraud of the receiver, hence, it should be borne by the accountant individually. The court below concluded that, under the view it took of the case as a whole, the receiver ought not to have been allowed any credit whatever on this account, and that he should be surcharged with the sum already paid. It appears that neither the propriety nor reasonableness of the $5,150 fee was questioned before the auditor or raised by exception below. If the court felt that there was not sufficient evidence to show whether the fee paid by the receiver was reasonable and proper, it should have referred the matter back to the auditor so that counsel might appear and prove their services in detail. It is quite certain that counsel rendered services which would have been required under a proper administration of the estate, and for such the fund is liable. The printed argument of the appellant indicates that had the fees paid been questioned they could have been fully sustained by evidence. The court below is directed to afford counsel the opportunity to present proofs in support of the fees paid to them; or if, without further proofs, it feels that, in the light of the dis-

position made by this court of the various matters involved in the present appeal, the payment of $5,150 to counsel represents a proper charge against the estate, it may decree accordingly. In any event, it is the duty of the court below to determine and allow the value of the services rendered by counsel in actual aid of the estate, and there can be no doubt but that these were considerable.

The auditor also allowed the receiver credit for $1,-500 paid to counsel at York. As to this the court states, "It does not appear that any of the expenses incurred at York were necessary and for the benefit of the estate"; and it suggests that the receiver should be surcharged the entire $1,500. In view of the difference of opinion between the auditor and the court on the subject of these fees, and owing to the lack of proofs showing exactly what services were rendered in the conservation of the estate, and how much of the fees paid are chargeable thereto and how much are chargeable to useless services connected with the ancillary receivership at York (that receivership having been declared by this court to be unnecessary and unlawful), we feel it impossible, as the record now stands, to pass judgment upon this part of the case. The findings of the auditor seem to indicate that, at least, a portion of the $1,500 covered services in connection with the ancillary receivership that were of no benefit to the estate, and we agree with the court below that this part of the fee is properly chargeable directly against the receiver; but we feel that so much thereof as covered services in aid of the conservation of assets stands on a different footing, and that such services are entitled to reasonable compensation out of the fund for distribution; this is true even though the attorney was employed by the local York receiver. The court below is directed to afford counsel an opportunity to present proofs, and to adjust the matter of these fees in accordance with the

views here expressed; if no further proofs are offered, of course, the suggested surcharge will prevail.

"AUDIT EXPENSES."

The expenses of the audit amounted to $2,553.28, and the auditor requested a fee of $10,000; although it was not objected to, the court cut the fee to $5,000, and decided that Richards, personally, would have to pay both of these items, in all $7,553.28. The amount of the fee to be paid to the auditor is peculiarly for the appointing court to determine, since he is its officer; but, considering the difference in the views entertained by this court and those expressed by the learned court below upon the general conduct of the audit and in relation to many of the items involved therein, we suggest that the subject of the auditor's fee should be reconsidered in the light of the present opinion; this, however, we leave to the wise judgment of the court below. The expenses charged against the receiver include a number of items properly payable out of the funds of the estate. We feel that, since the conduct of the accountant in the management of his trust was largely responsible for the complexity and consequent costliness of the audit, a large proportion of the expenses should be borne by him, but that at least $1,000 thereof should be paid by the estate; further, that one-third of the auditor's fee as finally fixed should be assessed against the receiver and two-thirds against the estate, and we so direct.

After the long delays already encountered, it is to be regretted that we cannot pass final judgment upon every point involved in this appeal; we have endeavored, however, to cover the case as thoroughly as possible and to state our views on each of the several subjects touched upon by the court below, so that when the record is returned to it they may be treated accordingly. There are a number of items referred to in the printed argument of the appellees which are not discussed in the opinion of the court below or specifically adverted to here. Most of these items are comparatively small and

as to some of them there may be room for opinions differing from those of the auditor; but since he has found the relevant facts, which sustain his conclusions pertaining thereto, the items will not be taken up by us. Where we have not indicated otherwise all the conclusions of the auditor are to stand as stated in his report.

The record is remitted to the Common Pleas with instructions to dispose of the case and modify its decree in accordance with the views expressed and directions contained in this opinion; two-thirds of the costs to be paid out of the fund and the balance by the appellant Richards.