46

Alice S. HIGGINS, Plaintiff, on Behalf of Herself and Other Stockholders of Shenango Pottery Company, Similarly Situated, and Hilda Barkby, Administratrix of the Estate of Harry Barkby, Deceased, Intervenor,

v.

SHENANGO POTTERY COMPANY, Now Shenango China, Inc., a Corporation; James M. Smith, Jr., George B. Zahniser, Charles W. Read, Daniel H. Treloar, Jr., Zeno J. Pfau, John B. McCarty and Alvah M. Shumaker, Individually and James M. Smith, Jr., George B. Zahniser, Charles W. Read, Daniel H. Treloar, Jr., Zeno J. Pfau, John B. McCarty and Alvah M. Shumaker, Trading as Castle Engineering Company, a Partnership, Lynne Anderson Warren and Peoples First National Bank and Trust Co., Executors of Estate of James M. Smith, Jr., Deceased, Defendants.

Alice S. Higgins, Etc. and Hilda Barkby, Etc., Appellants in No. 13,026 and No. 13,027

Shenango Pottery Company, Now Shenango China, Inc., a Corporation, Appellant in No. 13,060.

Lynne Anderson Warren and Peoples First National Bank and Trust Co., Executors of Estate of James M. Smith, Jr., Deceased, Appellants in No. 13,061

George B. Zahniser, Appellant in No. 13,062.

Nos. 13026, 13027, 13060–13062.

United States Court of Appeals Third Circuit.

Argued March 25, 1960.

Decided May 10, 1960.

Rehearing Denied June 20, 1960.

Thomas L. Wentling, Pittsburgh, Pa.
(Lynne A. Warren, Upper Nyack, N. Y.,
James M. Arensberg, Richard B. Tucker, Jr., Patterson, Crawford, Arensberg & Dunn, Pittsburgh, Pa., on the brief), for appellants, at No. 13061.

W. Walter Braham, New Castle, Pa. (Alvah M. Shumaker, New Castle, Pa., on the brief), for appellant at No. 13062 and appellees at Nos. 13026 and 13027.

Harold R. Schmidt, Pittsburgh, Pa. (John L. Laubach, Jr., Rose, Houston, Cooper & Schmidt, Pittsburgh, Pa., Morris Berman, Hancock, Dorr, Ryan & Shove, Syracuse, N. Y., on the brief), for appellants at Nos. 13026 and 13027, and for appellees at Nos. 13060, 13061, 13062.

John V. Bowser, Pittsburgh, Pa., for appellant at No. 13060.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The facts in this case are set forth at length in Higgins, et al. v. Shenango, Pottery Co., et al., 3 Cir., 1958, 256 F.2d 504, but for clarity a résumé is appropriate.

This is a derivative action brought by a stockholder of Shenango Pottery Co., a Pennsylvania corporation, (Shenango) engaged in the manufacture of chinaware. Several of the defendants were officers and directors of Shenango: James M. Smith, Jr., now deceased, son of the founder and Chairman of the Board, James M. Smith, Sr., was a director and president; George B. Zahniser, a nephew of Smith, Sr., was a director and vice-president; Charles W. Read, since dismissed as a defendant by stipulation, was a director and vice-president. The remaining individual defendants were in no way connected with Shenango: Daniel H. Treloar, Jr. was in the life insurance business; Zeno J. Pfau was an automobile dealer; Alvah M. Shumaker was an attorney; and John B. McCarty was a bar manager. The principal plaintiff, Alice S. Higgins, daughter of Smith, Sr. and sister of Smith, Jr., is a minority stockholder of Shenango.

On January 31, 1944 the Pittsburgh Ordnance District of the War Department offered Shenango the opportunity to participate in a non-magnetic land mine program. The principal parts of the mine, the bell and base, were to be ceramic, larger and heavier than ordinary dinnerware and involved an operation foreign to the manufacture of dinnerware, that of threading the parts to fit with other pieces. On February 5, 1944 Smith, Jr., Zahniser and James K. Love, the latter another director of Shenango but not a party here, traveled to the Onondago Pottery Company in Syracuse, New York to investigate the land mine program already in operation at that firm. Based on this investigation they recommended to the remaining three directors, Smith, Sr., Jonathan Higgins, husband of the principal plaintiff and Charles W. Read, that Shenango refrain from entering the land mine program.[1] The considerations prompting this recommendation ostensibly were a complicated assembly operation, rigid government tests and a requirement of additional space and labor. As a result the Board decided it was not feasible for Shenango to bid for a mine contract.

Several days subsequent to the decision, Smith, Jr., Treloar and Pfau investigated the possibility of undertaking the manufacture of mines and, as a result, begain formation of a corporation, Castle Engineering Company (Castle). Castle submitted a bid which was not acceptable to Pittsburgh Ordnance because Castle was not as yet a corporate entity. It was then decided, allegedly at the instigation of Pittsburgh Ordnance, that Shenango's name be inserted in place of Castle and upon award of the contract to Shenango, to have it sublet to Castle. Smith, Jr. immediately telephoned Shenango from Pittsburgh and had the proposal put before the other five members of the Board who were present at Shenango. The Board approved. On this point, the district court found, as a conclusion of law, that the business judgment of the five board members was influenced by the knowledge that Smith, Jr. and two other directors and officers of Shenango, Zahniser and Read who had previously joined with Smith, Jr., Treloar and Pfau, were interested in Castle. The contract was awarded to Shenango which in turn sublet it to Castle, with the exception of the part calling for the manufacture of the ceramic base and bell. These parts Shenango was to supply at two dollars for every pair accepted and paid for by the government. At this stage it would be well to outline the full import of that arrangement.

The government inspection of the land mines consisted of a waterproof test and a drop test. Five mines were submerged in water for twenty-four hours, at the end of which time they were disassembled. If any trace of water was found, ten more were put through the same test and if water was found in any one of the ten the entire lot was rejected. After that five mines were dropped from a prescribed height on to concrete. If there was a failure of any of the parts of more than one mine, ten others were tested. If three or more of the fifteen showed failure the entire lot was rejected. Castle contracted to have the inspection on the basis of a lot consisting of ten thousand mines. Thus if either test was failed the entire ten thousand mines would have been rejected and Shenango would not receive payment for any of the ten thousand pairs of bases and bells, which were the most expensive part of the mine. It should be further noted that although the contract was sublet, Shenango remained liable thereon.

[1.] It was brought out at the trial, on cross-examination of Zahniser, that at this time Smith, Jr. believed the operation could be profitable:

"Q. Did he [Smith, Jr.] tell you that he believed that the assembly job could be done profitably? A. He did, he told me that he got that impression by his trip to the Onondago and to the Ohio Brass Company.

* * *

"Q. And that was after paying Shenango Pottery $2.00 a pair for the ceramic parts? A. That is correct."

Castle was reorganized into a limited partnership; Smith, Jr., and Treloar becoming the general partners and Zahniser, Pfau and Read, later joined by Shumaker and McCarty, being the limited partners. It had a stated paid-in capital of $50,000 of which only $32,200 was actually paid in by the end of the fiscal year, July 31, 1944. The question of the validity of the limited partnership was raised. However, it is irrelevant since in our previous opinion we stated that the liability of the limited partners for return of improperly received profits is not limited by the amount of their partnership contribution. 256 F.2d at page 510.

Castle drew heavily on the financial resources of Shenango, and in many of its negotiations used the name, reputation and credit rating of Shenango. The trial court found that even the bid submitted by Castle contained information descriptive of Shenango but the court felt the constant use of Shenango's name was merely carelessness; a conclusion not borne out by the record.

Castle subsequently was awarded two other contracts, one of which was terminated with a monetary allowance before any land mines were supplied under it, both of which contracts the court held were corporate opportunities diverted from Shenango. The total net profit to Castle was $326,603.71 in a little over nine months.[2] Eventually this was reduced, as excessive profit, to $181,603.71 on renegotiation by the War Contracts Price Adjustment Board. Shenango made a profit of $248,587.58 on the manufacture of the base and bell. This was not renegotiated. Defendants argue that Shenango's profit is proof that they had the common good in mind and that there was no improper diversion of corporate opportunities; that the land mine project was in reality a joint venture between Shenango and Castle. This argument can be dismissed forthwith. Leaving behind a portion of the spoils is hardly justification. It leaves unanswered much the same question as arose in Tenth National Bank of Philadelphia v. Smith Construction Co., 1913, 242 Pa. 269, 287, 89 A. 76, 82. There officers of the Smith Company formed a partnership, the Maryland Company, to furnish services and supplies to the Smith Company at a profit. The court stated:

" * * * the 10 per cent. paid to the Maryland concern might have been saved to the Smith Company, —in substance it was nothing more or less than a commission for services that could have been performed directly by the officers of that company. Again, if the Maryland Company could furnish coal and horses to the Smith Company at a profit, it has not been made plain why the men who constituted that concern did not perform this service directly as officers of the latter corporation, and thus save to it the amount of such profits. Cases may be cited where the officers of a corporation have been permitted to make and retain profits for themselves through the formation of outside agencies controlled by them, which profits they could have saved to their constituent company had their thought been only for its welfare; but in such instances the law has ceased to look at the mere form of the device employed—it now pierces through the surface and seizes upon the evils which lie within."

On January 5, 1950, after several futile demands that the Board of Directors act to recover profits diverted from Shenango to Castle, plaintiff instituted this stockholder's derivative action. At the close of plaintiff's evidence the district court dismissed the suit against defendants Pfau, McCarty and Shumaker under Rule 41(b), Fed.R.Civ.P. 28 U.S.C. The plaintiff appealed and this court, in an amended opinion filed June 24, 1958, reversed and remanded the cause. 256 F.2d 504. However, prior to our de-

---

2. From this amount was deducted a $10,000 liquidation expense leaving a net operating profit of $316.603.71.

cision, the district judge on May 23, 1956 pursuant to a lengthy adjudication which included 111 findings of fact and 17 conclusions of law found defendant Treloar not liable on the merits and gave judgment against the Estate of Smith, Jr. and Zahniser, jointly and severally, in the sum of $316,603.71 with interest at 6% which totaled $538,396.99. Then on October 3, 1956, the district judge granted a new trial on the issue of damages only. The matter came on for trial in March of 1959. Because of this court's remand, evidence was taken on the issue of liability of the defendants, Pfau, McCarty and Shumaker. And since final judgment had not been entered in favor of Treloar, the question of his liability was reopened.

On July 29, 1959 the district court entered an amended order for judgment again exonerating Treloar, Pfau, McCarty and Shumaker, and holding Zahniser and the Smith, Jr. Estate liable. As to damages the court determined these to be Castle's profit after renegotiation with the War Contracts Price Adjustment Board, namely, $181,603.71. It fixed the rate of interest at 3%, rather than 6%, from the date the profits were realized. Including interest, the damages amounted to $262,456.58.

Plaintiff appeals from that part of the judgment dismissing the defendants Castle, Phau, Treloar, McCarty and Shumaker and reducing the amount of damages. Defendant Shenango appeals from the judgment dismissing the above named defendants. Defendants Zahniser and the Estate of Smith, Jr. appeal from the judgment entered against them. As set out in the opinion of the district judge, this litigation is in such posture that should we disagree with the judgment below or any part thereof, we may direct whatever judgment as is required by the evidence and the law.

The questions in the various appeals can be divided under three major headings: The liability of Zahniser and the Estate of Smith, Jr.; the liability of the other defendants; and the amount of damages.

Liability of Zahniser and Smith, Jr.

The trial judge considered the inspection and recommendations made by Smith, Jr., Zahniser and Love, and the resulting action of the entire Board determining it would not be feasible for Shenango to enter the mine program as having been made in good faith and as a business judgment. However, the subsequent events; Smith, Jr. forming a company to pick up the opportunity rejected by Shenango on his recommendation and vote; Zahniser joining him and later Read; the Directors of Shenango, upon Castle's bid being rejected, reversing their previous decision and with knowledge that Smith, Jr., one of their number and son of the Chairman of the Board, was prime mover of Castle, authorizing Smith, Jr. to bid in the name of Shenango for the benefit of Castle; these events, the court found, demonstrated that Smith, Jr. and Zahniser, knowing that either Shenango or Castle had a prospect of making a profit were then in a conflicting position and, being in a fiduciary relation to Shenango should have refrained from participating in Castle. The trial court went on to find that their association in Castle was a breach of a fiduciary duty but done in good faith.

We disagree. Considering those transactions following the original Board decision to reject the contract as separate and distinct from the events leading up to and including the original decision merely ignores the bad faith which permeates the entire scheme.

That the Board on February 5, 1944 rejected the mine program in good faith and as a business judgment is in no way dispositive; the important question is the good faith of Smith, Jr. and Zahniser in making the recommendation upon which the decision was based. This recommendation was, according to testimony of Zahniser, based on a half-day's inspection of the mine operation at Onondago Pottery Company. Yet, before organizing and submitting a bid for Castle, Smith, Jr. with Treloar and Pfau, inspected the mine operation at

Ohio Brass Company, Barberton, Ohio, determined the price per mine at which the Army intended to let the contracts, estimated at which price they could buy the ceramic parts and still make a profit, began planning for the necessary equipment, contacted various suppliers of parts and machinery, determined the availability and price of parts and searched for available space needed for the assembly. Two of the three officers, Smith, Jr. and Zahniser, who made the recommendation to Shenango and voted on it subsequently formed Castle. According to Zahniser, the recommendation and decision not to participate were made because of the problems of space, availability of labor and the complexity of the assembly operation. These very problems were quickly overcome by Castle, and the trial court found as a fact that the project was well within Shenango's corporate capabilities. It is impossible to understand why these problems made it unfeasible for a large, financially sound corporation like Shenango to enter the program when the embryo organization, Castle, under the guidance of Shenango's president reaped a tidy profit in like circumstances.

Plaintiff introduced into evidence letters sent to the War Contracts Price Adjustment Board and a Petition to the Tax Court for redetermination on behalf of Castle, which indicate that Smith, Jr., Treloar and Pfau were interested in the mine program even before the opportunity was offered to Shenango on January 31, 1944. By letter dated January 19, 1946 Castle's attorney requested a review of the Adjustment Board's determination stating therein, in part:

"The operations of the Company, which is a partnership, actually started early in January, 1944, through the individual efforts of Mr. James M. Smith and Mr. Daniel H. Treloar, Jr., the unlimited partners * * *. They began devoting all of their time to setting up for production of the mines long before March 22, 1944, the date on which

the partnership was formally organized * * *."

The Petition for redetermination to the Tax Court of the United States contained the following allegations:

"6. (o) The respondent erred in disregarding the fact that, although not then formally organized, the petitioner had actually been functioning and the petitioner's general partners has (sic) been performing services, since January, 1944.

7. * * * (a) * * * The members of the petitioner had been jointly engaged in preliminary work on said mine program since January, 1944."

The above was sworn to be a true statement by Smith, Jr., Treloar, Pfau, Zahniser, Read, McCarty and Shumaker.

A letter dated December 30, 1944 to the Price Adjustment Division of Pittsburgh Ordnance District signed by Treloar on behalf of Castle included the following:

"In the latter part of 1942 and early 1943 James M. Smith, Jr., Zeno Pfau, and D. H. Treloar, Jr., were investigating the possible adaptability of china and porcelain to such war items as bombs, mines, etc. * * * During this formative period no formal organization existed and all expenses resulting from these efforts were paid by the individuals mentioned above."

The trial court felt that the above were " * * * summaries made after the events occurred, and upon which little probative value is placed because of the purpose for which they were prepared." These were statements, one sworn, made to a government agency and the Tax Court indicating a pre-existing interest in the very program later rejected by Shenango on Smith, Jr.'s recommendation. This evidence was contradicted by the deposition of Smith, Jr. and the testimony of Treloar and Pfau to the effect that the land mine program was first discussed among the three, casually over lunch, sometime after She-

nango rejected the opportunity. The trial court bolstered this claim in its adjudication stating: "It is clear and proven as an undisputed fact that the letter of January 31, 1944, from the Pittsburgh Ordnance District to Shenango was the first communication or actual notice to Smith, Jr. of the land mine program." However, this was contradicted by the trial court itself in its finding of fact No. 73, that "At or about this time [late 1943 or January 1944 but prior to January 31, 1944] it was known at Shenango Pottery Company that a land mine using china parts was being made by Onondago Pottery Company."

Added to all of the above is the astounding fact of the Shenango Board of Directors suddenly accepting the mine contract, after a telephone call from Smith, Jr. only sixteen days after it rejected the same contract. Shenango, outstanding in its field, at the time the largest producer of pottery in the world, first refuses to enter into a contract because of the difficulties involved and immediately thereafter, agrees to accept full liability under the same contract, *the liability hinging solely on the success or failure of a new, untried firm existing only on paper.* It was as to this later decision that the trial court found the business judgment of the Board was influenced by the knowledge that three of the Board members were organizers and owners of Castle.

Officers and directors are deemed, by the law of Pennsylvania which controls, to stand in a fiduciary relation to the corporation. 15 P.S. § 2852–408. As pointed out in our previous opinion at pages 507 and 508 of 256 F.2d:

"They [the directors and officers] were bound to act in the utmost good faith. They could not deal with the funds and property of Shenango nor utilize the influence and advantage of their offices for any but the common good. If they made a personal profit through the use of Shenango's assets they were accountable for it to the stockholders; they were not permitted even to

place themselves in a position which invited conflict between their self-interest and their integrity." (citing Lutherland, Inc. v. Dahlen, 1947, 357 Pa. 143, 53 A.2d 143; Bailey v. Jacobs, 1937, 325 Pa. 187, 189 A. 320).

In view of all the circumstances we reaffirm what we previously said:

"Plaintiff's above detailed evidence clearly points to a conflict between the Shenango officer and director defendants' obligation to their company and their self-interest. That evidence indicates those defendants used most every element of Shenango but the hotelware product itself for their own selfish interest."

The actions of defendants, Smith, Jr. and Zahniser, while short of fraud or deceit, were in calculated indifference to the corporate common good. We agree with the trial court that both are liable but the further finding of good faith is clearly erroneous and is set aside.

Liability of the Other Defendants

█ We held in our first opinion that the limited partners would be liable, jointly and severally with the general partners irrespective of their limits of liability, if the partnership is found to be liable. 256 F.2d at pages 509–510. However, the district court considered that the limited partners were not liable and "That being so, it necessarily follows that Castle Engineering Company as a partnership entity is not liable." That is the reverse of the proposition we set forth. The Uniform Partnership Act, 59 P.S. § 34 states: "Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind * * * operate as notice to or knowledge of the partnership * * *." The evidence is indisputable that Smith, Jr., Zahniser and Read, the corporate fiduciaries, had knowledge or should have had knowledge of their breach of duty and such knowledge was acquired

while partners in Castle and while acting in partnership affairs. This is knowledge of the partnership and "The partnership in such situation would be liable for any profits realized from a breach of their fiduciary duty by a number of the partners for the purpose of benefiting the partnership at the expense of Shenango." 256 F.2d at pages 509–510. The general partner, Treloar, and the limited partners, Pfau, McCarty and Shumaker are jointly and severally liable with Smith, Jr. and Zahniser for the profit improperly diverted from Shenango.

These latter four defendants are also liable on the theory of constructive trust:

"Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, if he gave no value or if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary." Restatement, Restitution § 201(1). See Spivak v. Bronstein, 1951, 367 Pa. 70, 75–76, 79 A.2d 205; Columbia Cas. Co. v. Westmoreland County, 1950, 365 Pa. 271, 274, 74 A.2d 86.

"Notice need not be actual. A purchaser is chargeable with notice of the trust, where the facts and circumstances existing at the time of the purchase, within his knowledge, are such as would put a man of ordinary prudence upon inquiry and require him to make an investigation, and he fails to do so * * * no particular kind of evidence is necessary to constitute notice." Cameron v. Peoples' Bank of Maytown, 1929, 297 Pa. 551, 556–557, 147 A. 657, 659. Columbia Cas. Co. v. Westmoreland County, supra, 365 Pa. at page 274, 74 A.2d at page 88; Custis v. Serrill, 1931, 303 Pa. 267, 270, 154 A. 487.

In Spivak v. Bronstein, supra, 367 Pa. 74–75, 79 A.2d 207, a taproom and restaurant owner continued a partnership arrangement with the administratrix of his former partner's estate. There the court said:

"The agreement was with a fiduciary whose limitations to enter into such a contract defendant was bound to know * * *. Defendant should have known that without approval of the court, the contract he entered into with the plaintiff afforded him no protection against anyone beneficially interested in the estate * * *. So also he was bound to know that the minor son of his deceased partner * * * could act only through his lawfully appointed guardian. He was bound to know also that the mother could not under the law have been appointed guardian because of incapacity both as parent, * * * and as administratrix."

The inquiry which faced defendants here was much less stringent than that demanded by the court in Spivak. "A person has notice of a fact if he knows the fact, has reason to know it, should know it, or has been given notification of it." Restatement, Agency 2d § 9(1).

"A person has reason to know of a fact if he has information from which a person of ordinary intelligence * * * would infer that the fact in question exists or that there is such a substantial chance of its existence that, if exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence. The inference drawn need not be that the fact exists; it is sufficient that the likelihood of its existence is so great that a person of ordinary intelligence * * * would, if exercising ordinary prudence under the circumstances, govern his conduct as if the fact existed, until he could ascertain its existence or non-existence." Restatement, Agency 2d § 9, Comment (d).

Treloar, as a general partner, had all the facts at his command. The other three limited partners had knowledge of

the circumstances sufficient to spur them to inquiry. They made little or no investigation.[3] They cannot be allowed to escape responsibility because they, in effect, say they closed their eyes to the obvious. All are jointly and severally liable with Smith, Jr. and Zahniser.

## Damages

■ In its opinion after the second trial the district court held that under

the principle of unjust enrichment the actual profit received by Castle is the amount to be returned to Shenango. The court ordered judgment in the amount of $181,603.71, the amount of profit to Castle after renegotiation with the Price Adjustment Board. The plaintiff argues forcibly that the renegotiation was personal to Castle and should not be considered when determining the loss to Shenango; that Shenango could have made

---

[3]. John B. McCarty testified:

"Q. You knew he [Smith, Jr.] was an officer and director, did you not? A. I knew he was connected with the pottery, yes, sir.

"Q. And you knew that Mr. Zahniser was an officer and director, did you know that? A. I know Mr. Zahniser was connected with the Pottery, but I didn't know he was an officer to be truthful with you.

"Q. Did you know he was a director? A. No, I didn't.

"Q. Did you know Mr. Read was an officer and director? A. I knowed Mr. Read was, yes, sir.

"Q. Mr. McCarty, knowing that Mr. Zahniser and Mr. Smith, Jr. and Mr. Read were connected with Shenango and were also connected with Castle Engineering did you do anything to try to find out what the facts were in the situation so as to determine whether it was all right to be in that land mine project? A. No, I didn't.

"Q. You made no inquiry? A. I wasn't interested. I didn't know a thing about what went on with the land mines at all.

"Q. Did you make any inquiry as to the relationship between Shenango and Castle Engineering Company? A. No, sir."

Zeno Pfau testified:

"Q. Did you know, Mr. Pfau, that Shenango Pottery Company did take the first land mine contract itself, did you know that? A. No. Yes, I did too.

"Q. I beg your pardon. A. I believe I did. I believe I was told that they took it to hurry up the order, as I understand it. Now, I don't remember that in detail. I wasn't too much consulted on this.

"Q. What is your best recollection as to what you were told about Shenango taking the first land mine contract? A. I possibly didn't know about it until after it happened. I don't know."

Alvah M. Shumaker testified:

"Q. Well, now, you say that you were aware of the possible conflict of interest but you came to the conclusion that in this particular case there was no reason

to be concerned, or words to that effect, is that correct? A. Well, let's say words to that effect.

"Q. Then your last answer was—— A. Yes.

"Q. Now, I will ask you then, being on notice of a possible conflict of interest will you tell me in detail to the best of your recollection what inquiry you made in order to resolve in your mind the question so that you concluded that there was no danger from that conflict of interest? A. The information that I had from Smith; the information I had from Treloar; the fact that I had known of the pottery for some time and knew that they manufactured ceramics exclusively, and it was in my knowledge they never manufactured or assembled anything else. So far as going further and asking questions, I asked no questions, but I felt that the information that had been furnished me and supplemented by the information of Mr. Zahniser at our meeting of March second, and supplemented by the unanimous resolution of the board of directors, as represented to me, satisfied me that the transaction was a good proposition for both Castle Engineering and Shenango Pottery.

"Q. Then, I think in the last answer you gave you were pushing the time back until after the directors' meeting. My question, Mr. Shumaker, was directed to what inquiry you made at the original conference concerning the land mine business on February 16 which was before that meeting took place on February 21. A. I accepted what Mr. Treloar and Mr. Smith told me about the arrangement which we have been discussing.

"Q. Well, is it correct to say that on accepting the information given to you by Mr. Smith, Jr. and Mr. Treloar that you made no independent investigation or inquiry of your own? A. That is right. You mean at the time.

"Q. At the time, which would be before February 21, 1944, is that correct? A. That would be correct."

the same profit but because of its broader financial base the profit would not have been excessive. This fails to take into account that the $326,000 realized by Castle would be swelled by the $248,000 netted by Shenango on the production of the ceramic base and bell. Whether that would or would not have been renegotiated is speculative.

The Renegotiation Act, 56 Stat. 245, 50 U.S.C.A.Appendix, § 1191(a) (4) (B), defines profits as "The excess of the amount received or accrued \* \* \* over the costs paid or incurred with respect thereto." Excess profits have been defined as "those profits in excess of all the legitimate costs incurred in production, plus a normal profit, all of which are to be determined in accordance with designated formulas." Atkinson v. New Britain Mach. Co., 7 Cir., 1946, 154 F.2d 895, 904. A method by which costs may be calculated is set forth in the Act. To determine the existence of excess profits, Section 4(A) requires consideration of six explicit factors and "such other factors \* \* \* published in the regulations of the Board from time to time \* \* \*." This Act was administered by the War Contracts Price Adjustment Board (50 U.S.C.A.Appendix § 1191(d) now the Renegotiation Board (50 U.S. C.A.Appendix § 1217), which, like most other administrative agencies, was particularly adapted to the task for which it was created. On the other hand this court has no part in the actual renegotiation of wartime contracts. The Act provides that the Tax Court has exclusive jurisdiction to redetermine the amount of excess profit. 50 U.S. C.A.Appendix, § 1191(c), (e). We possess no jurisdiction, except to review constitutional and jurisdictional questions. United States v. Martin Wunderlich Co., 1954, 94 U.S.App.D.C. 8, 211 F.2d 433. What the plaintiffs seek is a determination by us whether the full profit in the hands of Shenango would have been renegotiated, and if so, in what amount. We could not do so with any degree of accuracy. Under the circumstances the loss to Shenango is at best a guess. It seems more equitable, and accurate, to award the amount by which the defendants were unjustly enriched; the renegotiated sum of $181,603.71.

On the second trial the district court also reduced the originally fixed rate of interest from 6% to 3%. The ruling was based on what "the sum involved would ordinarily have earned in the money market," during the period involved. The court found that rate to be from 2½ to 4⅓% and concluded a rate of 3% would be fair. An excellent discussion of the trend of courts to fix interest at less than the legal maximum based on rates prevailing in the local money market is found in Speed v. Transamerica Corp., D.C.Del.1955, 135 F.Supp. 176, 199–201. On appeal we held that fixing the rate of interest is a matter peculiarly within the discretion of the court. 3 Cir., 1956, 235 F.2d 369, 374. The trial court in this instance used a correct standard in adjusting the rate. There was no abuse of discretion.

We have reviewed all of the remaining contentions of the parties, including the return of the salaries paid by Shenango to Smith, Jr. and Zahniser, defense of laches, and compensation sought for the services rendered by Treloar. The question of laches was passed upon in our prior opinion, 256 F.2d at page 511. The other problems were properly decided by the trial court and need no discussion.

The judgment of the district court will be reversed as to defendants, Daniel H. Treloar, Jr., Zeno J. Pfau, Alvah M. Shumaker and John B. McCarty, individually, and as to Lynne Anderson Warren and Peoples First National Bank and Trust Co., as Executors of the Estate of James M. Smith, Jr., deceased, George B. Zahniser, Daniel H. Treloar, Jr., Zeno J. Pfau, John B. McCarty and Alvah M. Shumaker, trading as Castle Engineering Company, a partnership, and the case remanded to the district court with direction to enter judgment against all of said defendants and in favor of She-

nango Pottery Company in the sum of $262,456.58.

The balance of the judgment of the district court will be affirmed. Costs to be taxed against the defendants.