(No. 25408.—

P. F. GROOME *et al.* Appellees, *vs.* THE FREYN ENGINEERING COMPANY, Appellant.

*Opinion filed June 14, 1940.*

114

GARDNER, FOOTE, MORROW & MERRICK, and BROWN, FOX & BLUMBERG, (CHARLES LEROY BROWN, WALTER M. FOWLER, and DUGALD S. MCDOUGALL, of counsel,) for appellant.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, (WEYMOUTH KIRKLAND, HOWARD ELLIS, JAY FRED REEVE, J. B. MARTINEAU, and WILLIAM H. SYMMES, JR., of counsel,) for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

Appellees P. F. Groome and W. G. Stark, in 1929, brought suit against the Freyn Engineering Company in the circuit court of Cook county for an accounting and commissions claimed to have been earned on an agency contract between appellant and Groome and Stark. The bill alleged that Tarver, Steele & Company were interested in the claim and relief was prayed for all interested. Appellees obtained a decree and appellant appeals directly to this court on the ground that a construction of the constitution of the United States is involved.

The agency contract was executed by both parties in the United States, but it is claimed it contemplated perform-

ance in Russia. Appellant claims that by the law of Russia an agency contract involving the use of middlemen or agents is void. Appellant also claims that by a treaty between the United States and Russia, respecting reciprocal rights of corporations of each country to do business in the other, it was provided that the transaction of business in Russia by a corporation organized in the United States should always remain subject to the laws and regulations existing in Russia. Appellant contends that treaty became a part of the supreme law of the land under article 6 of the constitution of the United States, which makes such constitution and the laws enacted thereunder, and the treaties with foreign nations made in pursuance thereof, the supreme law of the land and binding on all the courts of the land. It is part of appellant's argument that the whole subject matter of the agency contract related to its transacting business in Russia, and that the treaty in question required such transaction of business to be subject to the laws of Russia existing at the time of such attempted transaction of business.

The treaty was made in 1904 between the United States and Imperial Russia. The Imperial government was overthrown by revolution in 1917, and the present government was not recognized by the State Department of the United States until 1933. Appellant contends that the Department of State has certified that the treaty of 1904 is still in force. Appellant claims that the treaty was continuously in force and effect throughout the years of the transactions here involved, notwithstanding the change in the government of Russia. The appellees counter by saying there was no treaty in effect from 1917 to 1933, and, if it were to be so held, it would deprive appellees of their property without due process of law. Appellant further argues that under the decisions of the Supreme Court of the United States the effect of the recognition of Soviet Russia by the government of the United States in 1933, was retroactively to

recognize the validity of all laws of the revolutionary Soviet government from its inception in so far as those laws applied to any performance in Russia of the agency contract in question.

The question as to whether there was a treaty in effect during the time involved, and whether it had any application to the controversy, involves a consideration and construction of the constitution of the United States, which gives us jurisdiction (*VanDyke* v. *Illinois Commercial Men's Ass'n,* 358 Ill. 458) though later we determine the contentions made by appellant are ill-founded. *Clark* v. *Hanson,* 320 Ill. 480; *Geiger* v. *Merle,* 360 id. 497.

Appellees were connected with Tarver, Steele & Company, a corporation having extensive trading relations with Soviet Russia, principally in cotton. Groome was the manager of the New York office and Stark was an employee. Stark was born in Esthonia and, prior to the revolution, lived in Russia, where he became connected with substantial enterprises. About 1918, he moved to the United States and became an American citizen. The Freyn Engineering Company is a corporation doing general engineering business in metallurgical lines. A large and perhaps principal part of its business is to furnish expert engineers who prepare plans for large enterprises, such as steel plants, and supervise the construction and installation of the machinery and equipment required therein. In the latter part of 1924 the Soviet government was contemplating the construction of vast industrial plants, including steel works, under what later became commonly designated as the five-year plan.

The Soviet Republic was formed in 1923. It consisted of several States which had been formed shortly after the revolution of 1917. The constitution of the union was adopted in July, 1923. The highest body in the Soviet Republic is the Congress of Soviets. The second in authority is the Central Executive Committee of several hundred

members. The administrative bodies are called the Commissariat. The heads of each of these Commissiariats constitute a collective body called the Council of People's Commissars, which apparently has legislative as well as executive functions. The Council of People's Commissars has direct supervision over the Supreme Council of National Economy, which is responsible to the Council of People's Commissars. The Supreme Council of National Economy has supervision over Russian trusts. These trusts are similar, in some respects, to a corporation. They are created by statutory charters and the capital is furnished by the government, but they trade in their own names without responsibility on the part of the government for their transactions. Among these trusts was Gipromez which was engaged in the metallurgical engineering business along lines similar to the business of appellant.

Novostal was a Russian trust whose function was the construction of steel plants. There are many other Russian agencies mentioned in the record, among which is the All Russian Textile Syndicate, Inc., which deals in cotton and cotton machinery. This was the Russian institution with which appellees had been transacting their business prior to their arrangement with appellant. The Amtorg Trading Corporation was another Russian agency; it had an office in the United States, and was supposed to be the only channel through which goods, other than cotton, could move from the United States to Russia. Both of the last mentioned agencies of Russia were corporations organized under the laws of New York.

Henry J. Freyn, president of appellant, and appellee Stark, met each other the latter part of 1924 and discussed the possibility of appellant obtaining a contract to do some of the work contemplated in Russia. As a result of these conversations a written contract was entered into between appellant and appellees, as follows:

"THIS AGREEMENT, made and entered into this 18th day of August, A. D. Nineteen Hundred Twenty-five, by and between the Freyn Engineering Company, with principal place of business at 310 South Michigan Avenue, Chicago, Ill., aforementioned Party of the First Part, and P. F. Groome and W. G. Stark, with offices at 60 Beaver Street, New York City, N. Y., Parties of the Second Part:

"WITNESSETH:

"That the Party of the First Part by these presents does appoint the Parties of the Second Part, its exclusive selling agents for Soviet Russia, and grants to them the sole and exclusive and irrevocable representation in Russia in every respect and detail, including Engineering, Technical information, Drawings, Construction, Purchasing and/or Selling Machinery, Tools, and/or other Equipment pertaining to the Metallurgy Industry.

"The Party of the First Part hereby agrees that it will not sell directly or indirectly any of the above described information or equipment to any person, company, corporation, or any representative of the Union Socialist Soviet Republic (Russia) except through the Parties of the Second Part, here in the United States of America or elsewhere.

"The Parties of the Second Part hereby agree that they will not solicit inquiries from parties other than Party of the First Part, nor sell directly or indirectly any of the above described character of information or equipment obtained from parties other than Party of the First Part, to any person, company, corporation or any representative of the Union Socialist Soviet Republic (Russia).

"All Estimates, Proposals, Offers and/or Counter-offers, made by the Freyn Engineering Company, shall include Fifteen (15) Per Cent net commission for the Parties of the Second Part.

"Commissions shall be due and paid in proportional amounts to the cash payments received.

"All communications, correspondence, etc., shall be done through the Parties of the Second Part. Correspondence received directly from Soviet Russia has to be in originals or copies exchanged between both parties. The Party of the Second Part is to attend to personal communications, and has to be informed if some personal communications are started directly with the Party of the First Part.

"The Parties of the Second Part shall have the exclusive right to establish a sub-agency in Soviet Russia, when the time shall show the necessity for that.

"The life of this agreement shall extend for a period of Two Years, from the date hereof. The Parties of the Second Part shall have the right to renew this contract upon the same terms and conditions for an additional period of One Year from date of expiration of the Two-Year Term fixed in this agreement."

On May 19, 1927, an agreement was entered into between the appellant and the Supreme Council of National Economy of the Soviet Republic, to extend for a period of five years, which is described as an option contract but which, among other things, provided that appellant should be paid the sum of ten thousand rubles per month for a period of three years. At the agreed rate of exchange this amounted to the sum of $5,154 a month, and for the three-year period has a face value of $185,567. This contract also provided in great detail for payment of engineering services of appellant here and abroad, by commissions on estimated cost of possible enterprises involving expenditure of 50,000,000 rubles to 500,000,000 rubles. The monthly payments under the agreement of May 19, 1927, were paid regularly until March 2, 1929, when a new contract was made in substitution thereof.

In August, 1928, preliminary to this new contract, some changes were deemed necessary to make provision for the presence of a large number of American engineers, employees of appellant, to reside in Russia to personally superintend the construction of large metallurgical plants determined upon by the Russian government. The draft of this contract was prepared and submitted by appellant to Russian officials in August, 1928, but was not executed until March 2, 1929. It was signed in the United States by a Russian representative of both the Gipromez trust and The Supreme Council of National Economy, and provided for payment to appellant of $400,000 a year, plus certain allowances for living expenses and travel, for its services, in lieu of the commissions fixed in the original contract for the same type of work. Under the contract of May 19, 1927, appellant received a net sum of $369,433.15. Under the contract of March 2, 1929, appellant received the net sum of $1,151,016.39.

On June 4, 1930, appellant entered into a contract with Novostal, a Russian trust, from which it received the sum

of $376,980, and on October 18, 1930, appellant obtained another contract with Gipromez from which it received the net sum of $178,180. Appellees claim a commission of fifteen per cent upon all the sums above mentioned and did receive upon the first contract as commissions the sum of $12,740.60. The unpaid commissions amount to $298,600.85, upon which interest had accrued in the sum of $124,603.61, making a total of $423,204.46, for which appellees obtained a decree against appellant.

It will be observed that the first contract of May 19, 1927, made by appellant, was with the Supreme Council of National Economy, which had direct powers over the trusts, but the succeeding contracts were made with the particular trust for whom services were rendered, such as Gipromez and Novostal, with the approval of the Supreme Council of National Economy.

It is claimed that the government of Soviet Russia was formed with the idea of establishing a social order based upon the Marxian theory of government, which has for its basis a planned economy under the direction and control of the State, under which a contract involving the payment of a commission or the use of a middleman is absolutely void, and that under the treaty arrangement between the United States and Russia, it becomes the obligation of the courts of the several States to enforce the provisions of Russian law if applicable to the present case.

We find nothing in the treaty of 1904 which does more than to permit corporations of one country to bring and defend actions in the other country, subject to regulations, in respect to foreign corporations, which may exist in either country. There is no question raised in this case as to the right of appellant to transact business in Russia, nor is a question raised as to the right of any of the Russian trusts mentioned to transact business in the United States. The question, here, involves rights existing between appellant and appellees, both citizens and residents of the United

States, growing out of a contract between themselves, respecting earnings that might be had out of sales to either the Russian government or to some of its trusts under its direct supervision. We, therefore, conclude that there is no construction of the constitution of the United States involved that will affect the rights of the parties hereto, because the supposed treaty, if it is still in effect, does not purport to affect the rights of individuals, growing out of contracts between themselves, to deal with corporations within the treaty. Under such circumstances, the question involved is the application of conflicting laws of two jurisdictions as affecting the place of making and place of performance of the contract. It having been necessary to determine whether constitutional questions were involved, we are required to retain the case for the decision of the other questions raised. *Geiger* v. *Merle, supra.*

This brings us to a consideration of the alleged illegality of the agency contract. It is said the parties intended it to be performed in Russia and, therefore, the propriety of its purpose depends upon the law of Russia.

Where the laws of a foreign country are involved they must be proved as any other fact. (3 Jones on Evidence, p. 437; *Ennis* v. *Smith,* 14 How. 400, 14 L. ed. 472; *McDeed* v. *McDeed,* 67 Ill. 545.) If they are written laws the best evidence is a copy of the constitution or the statute under consideration. (*Hoes* v. *Van Alstyne,* 20 Ill. 201; *Knickerbocker Trust Co.* v. *Iselin,* 185 N. Y. 54, 77 N. E. 877; 113 A. S. R. (Anno.) 882; 3 Jones on Evidence, *supra.*) If the foreign law is established by court rulings or otherwise, they may be proved by a person having expert knowledge of such law, and he may properly refer to the decisions or precedents which declared it. Measured by these rules, the evidence is wholly insufficient to establish, as a fact, any law of Russia which would render the performance of the contract under consideration, void. It appears from the record that Russia has a written constitu-

tion and a written civil and criminal code which have been in effect from and after 1923. The text of such written laws is not in the record. Article 61 of the constitution is quoted by a witness but it is a provision solely for the creation of a State political institution to fight political or economic counter-revolutionary activities. None of these activities is defined nor the measures adopted to suppress them described or proved.

It is claimed the written civil law also prohibited middlemen. Such provision of the civil law does not appear in the record. Analysis of the testimony of the experts fails to disclose any well-marked line of judicial precedent. The authority cited was a Russian encyclopedia pertaining to the subject "middlemen." As a whole, the testimony of experts leaves the impression of a discourse on a political theory in which they assume the writings of Marx to be a law of Russia. In addition to the lack of precise proof of any law of Russia that has been violated, the action of the Russian officials, appearing in the record, tends to negative the claim. The Supreme Council of National Economy appears to have very large powers over foreign business. It is the department of the Russian government which executed the first contract, and has some supervision over the Russian agencies doing business in the United States which execute contracts and make purchases involving middlemen. A representative of this department also signed the contract of March 2, 1929. Knowing both appellant and appellees were citizens of a country where agency contracts are common, no protest or suggestion was made by such officers which would indicate their supposed law was being violated.

In *Holman* v. *Johnson* (Cowper 341) Lord Mansfield, in commenting on a like defense, said: "The objection to the contract that it is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general prin-

ciples of policy which the defendant has the advantage of contrary to the real justice as between him and the plaintiff."

In *Zeigler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180, the court said: "There is no precise definition of public policy, and consequently no absolute rule by which a contract can be measured or tested to determine whether or not it is contrary to public policy. Each case, as it arises, must be judged and determined according to its own peculiar circumstances. The public policy of the State or of the nation is to be found in its constitution and its statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials. [Citations.] Courts will not look to other sources to determine the public policy of a State. As was said in *Hartford Fire Ins. Co.* v. *Chicago, Milwaukee and St. Paul Railroad Co.* 70 Fed. 20, 'The public policy of a State or nation must be determined by its constitution, laws and judicial decisions—not by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public.'" Where, as here, the matters from which the public policy of Russia might be ascertained are not set out in the record, the statement above seems appropriate.

The contract of agency had for its object a proper purpose and could be performed, at least in part, in the United States. When the Russian agencies and appellant decided to make changes in the method of performance, the contract for this purpose was executed by the Russian trust and the vice-president of the Supreme Council of National Economy and the appellant in the United States, and certainly required coöperation of Freyn and his associates in his Chicago office to effectuate performance of the contract. Under such circumstances, a grave question arises whether the Russian law would ever apply even though it were proved to be as claimed by appellant. Illustrations of occasions in which defendants were held liable to their associates or

partners when they had retained all the profits earned in transactions tinged with illegality, are presented by the following cases: *Brooks* v. *Martin*, 69 U. S. 70, 17 L. ed. 732; *Brady* v. *Horvath*, 167 Ill. 610; *Holman* v. *Johnson, supra; Manchester and Lawrence Railroad Co.* v. *Concord Railroad Co.* 66 N. H. 100, 49 A. S. R. 582; *Teich* v. *City of Chicago,* 298 Ill. 498.

The contention is made that appellees did not make a sale under the agency contract. When the business in which appellant was engaged is taken into consideration, the purpose of the contract seems obvious. A large part of the business consisted in rendering engineering service for large and costly enterprises. It required a very large amount of technical skill, the drafting of detailed plans, the superintending of the construction and equipment of the enterprise undertaken, and the very nature of the calling was something that could not be manually delivered like a commodity. It was known that Russia contemplated vast enterprises in the line of work in which appellant was expert. Appellee Stark knew certain persons who might be effective in procuring a sale of the skill and commodity of appellant for use in Russia. In case appellees could interest the proper authorities in contracting for the services of appellant, the latter was to make the estimate of cost, but through the agency of appellees. For appellees to perform under their contract with appellant they could not physically deliver the services of appellant, but could only procure for them the right, under contract, to perform such services for an agreed consideration. Under this contract, if appellees were the efficient cause of producing a customer who was willing to buy the engineering skill or other property of appellant upon terms fixed by the latter, and such contract was actually entered into, the agent would be entitled to the compensation agreed upon, (*Henry* v. *Stewart,* 185 Ill. 448; *Hafner* v. *Herron,* 165 id. 242; *Monroe* v. *Snow,* 131 id. 126;) and in such cases an agent will not be deprived of

his commission because the principal assisted or took part in the negotiations which resulted in the contract for such services or property. *Rigdon* v. *More,* 226 Ill. 382.

A large amount of evidence appears in the record upon the question of whether appellees were instrumental in procuring the original contract of appellant in Russia. It is too voluminous to set forth. The master in chancery gave it a careful examination and reached the conclusion that the contract of May 19, 1927, was the direct result of the work of appellees, would not have been consummated without the earnest work of Stark, and that, without the latter's aid, the large contracts obtained by appellant in Russia would not have been made. We have examined this evidence and are satisfied that the conclusion of the master in chancery, in this respect, is supported by the evidence and, that being the case, we will not disturb it. *Fish* v. *Teninga,* 330 Ill. 160.

Under the contract of May 19, 1927, there had been received from Russia up to August 1, 1928, fourteen payments aggregating $84,937.51, and upon receipt of each of these payments appellant remitted to appellees fifteen per cent, aggregating the sum of $12,740.60. It is apparent the parties construed appellant's earnings thus received as coming within the terms of the agency contract. It is well settled that the construction given by both parties to a contract which might otherwise be doubtful, is entitled to great weight. *Nelson* v. *Colegrove & Co. State Bank,* 354 Ill. 408; *Northern Illinois Coal Corp.* v. *Cryder,* 361 id. 274.

Appellant claims that the contract of May 19, 1927, with the Soviet authorities was a mere option contract. We think it is more. Appellant was guaranteed and paid, while it was in effect, 10,000 rubles per month and was to be compensated, for services rendered, by commissions on plants costing from 50,000,000 to 500,000,000 rubles. The authorization of these immense works depended, to a large extent, upon their feasibility and practicability as might be

determined by the advice and skill of appellant. It is true the works mentioned might not be authorized, but the record shows that while this contract of May 19, 1927, was in force, appellant earned thereunder approximately $180,000 in excess of the monthly retainers paid.

While the contract of May, 1927, was to be effective for the period of five years, it was, nevertheless, terminated on March 2, 1929, and a new contract between appellant and Gipromez was substituted for it. This contract was signed by Valery Metzlauk, who acted both in the capacity of chairman of the board of directors of Gipromez, and as the vice-chairman of the Supreme Council of National Economy. The contract recites that it is in termination and *in substitution* of the agreement executed on May 19, 1927, although no formal consent to change by the Supreme Council of National Economy, as provided in the former contract, appears to have been had, except in the fact that the contract was signed by its vice-chairman. This change and substitution was made without notice to appellees, contrary to appellant's agreement to keep appellees fully informed. It provided that appellant should do substantially the same things as specified in the contract of May, 1927, but, in addition, provided for the construction of several specific works and the taking to Russia of a number of its engineers. It also made provision for settling the unpaid amounts upon the first contract amounting to 361,006 rubles, payable in United States currency, and further provided that appellant should be paid the sum of $400,000 each year, divided into monthly payments, beginning as of the first day of May, 1929, with the right upon the part of either party to terminate the contract on not less than three-months' notice before the expiration of each contractual year, with the provision that no termination should occur before April 30, 1931. There are many provisions in this contract substantially different from those in the contract of May 19, 1927, but the difference arises mainly from the fact that

the Russian trust, by this time, had ascertained the amount and character of the work that it would construct, and appellant was willing to fix a price per year for its services, with provision for the payment of expenses in addition to the fixed compensation.

Appellant claims that this was a completely new contract and was outside of the scope of the agency contract which provided for compensation to appellees. The appellees claim that the negotiations for this substitution were started during the time their agency contract was in force, and were closed and consummated after the three-year agency period had expired, for the purpose of defeating their right to commissions. Testimony was taken on this question and carefully considered by the master. In his report he held that while the 1929 contract specified a cancellation of the 1927 contract, yet it simply substituted other terms for the same work. This work had been going on all the time and was not other or different than would have been necessary under the 1927 arrangement but made changes in certain details pointed out above. The direct finding is made that appellant should account for all moneys received under the contracts of 1927 and 1929 with the Soviet agencies. We think this finding is amply justified by the evidence.

Appellees had an exclusive agency for the business in Russia and were, therefore, entitled to the benefit of the contract made during the agency. If appellant saw fit to change that contract without their consent, this would not deprive appellees of any benefits they were entitled to under the original contract, (*Rigdon* v. *More, supra,*) and if appellees elected to consider the new contract as a substitute for the old, as it recites, no reason has been pointed out why they would not be entitled to receive the agreed compensation from payments made upon the second contract. *Barnett* v. *Caldwell Furniture Co.* 277 Ill. 286.

Appellant takes the position that a substantial part of the money received by appellant was after the termination

of the three-year agency contract between appellees and appellant and, therefore, a sale of services *not made within the term* of the agency. The agency contract does not provide that all payments of commissions shall be paid during the term of the agency, but provides that the commissions shall be paid when the money is received by appellant, and this would include payments made after the termination of the agency, but arising out of the sale for which the agent had been the procuring cause. *Jacquin* v. *Boutard*, 157 N. Y. 686, 51 N. E. 1091; *Singer Sewing Machine Co.* v. *Brewer*, 78 Ark. 202, 93 S. W. 755; *Greene* v. *Freund*, 150 Fed. 721.

Appellant also claims that the contract was illegal because it, in effect, provided that appellees would procure work for appellant from the Russian government by undue corrupt influence upon officials in Russia, authorized to enter into contracts; that the contract between appellant and appellees was procured by fraud and deceit and false misrepresentations as to their prior business connections with the Soviet government and their ability to do anything to enable appellant to sell its services or material, and that appellees are deprived of their right to compensation because they violated their duty of loyalty to appellant by being interested in other enterprises, doing business in Russia adverse to the interests of appellant, and by the suppression and concealment of material facts from appellant at all times during the agency.

Evidence was introduced upon all these matters and findings were made by the master in chancery and the chancellor, adverse to the claims of appellant. It is sufficient to say that upon these questions the master who heard the witnesses was in a better position to determine the weight and credibility of the evidence. There is evidence to support his findings and they will not be disturbed on review. We, therefore, conclude that appellees are entitled to commissions under the contracts of May 19, 1927, and March 2, 1929, between appellant and the Soviet agency.

This brings us to a consideration of whether appellant is liable for commissions on the two contracts made with the Russian agencies, dated June 4, 1930, and August 18, 1930, respectively.

The rule is well settled that an agent is not entitled to commissions on a sale unless it is accomplished during the term of the agency. (*Oliver* v. *Sattler*, 233 Ill. 536; Restatement of Agency, sec. 446; 26 A. L. R. (Anno.) 784.) If appellees had been successful in only procuring the two contracts last mentioned, they could not recover commissions under their contract which had expired on May 19, 1928. The contract of June 4, 1930, was made with a different Russian trust by the name of Novostal, without the aid of any services from appellees other than bringing them into the original contract relationships with the Soviet authorities. The same is true of the contract of October 4, 1930, and while it is with the Gipromez trust, it is for different work and in a different locality than specified in the three-year contract. When the agency contract was made for a period of three years appellees knew that appellant might procure other work or make other sales if the first contracts were carried out in a way satisfactory to the Russian authorities. Likewise, appellees could at the end of the three-year period act for other engineering companies. The master did not make any recommendation as to appellant's liability on these two contracts but the chancellor held it liable. This was error on the part of the chancellor. Appellant was not liable, under the contract it had with appellees, for commissions on sales made after the termination of their contract, without a special agreement to pay.

The contention is also made that it was error to allow commissions based upon the total sales price, as this total price included the commission that was to be paid appellees. We do not think this claim is substantial. The parties have construed the contract otherwise, and the payments that

have been made have been based upon a construction that appellees were entitled to fifteen per cent of the amount received by appellant. Plausible reasoning is advanced to sustain this claim made by appellant, but it seems somewhat strange that a great engineering firm, which could calculate to a nicety the detailed cost of vast steel projects, would have paid appellees on the basis it did if such was not also its understanding of the contract.

It is contended, also, that interest should not have been allowed. The claim was on a written contract and the time of payment of the commissions coincided with the time money was received by appellant. The latter, therefore, knew when payments were due. The Interest statute (Ill. Rev. Stat. 1939, chap. 74, par. 2) provides: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond * * * or other instrument in writing." It was also to be considered that this was a suit in equity to obtain an accounting. Years of time were consumed before there was a decree and the amount due appellees fixed. In a proper case, equitable considerations permit a court of equity to allow or disallow interest as the equities of the case may demand. (*Duncan* v. *Dazey,* 318 Ill. 500; *McKey,* v. *McCoid,* 298 id. 566.) In this case interest was properly allowable upon commissions found owing to appellees.

The other contentions made in the briefs have been duly considered, but are not commented on or included herein to avoid undue length of this opinion. The decree of the circuit court of Cook county is reversed, in so far as it holds appellant liable for commissions and interest growing out of the contracts of June 4 and October 18, 1930, and is, in all other respects, affirmed.

*Affirmed in part and reversed in part.*