**ATKINSON v. NEW BRITAIN MACH. CO.**
No. 8825.

Circuit Court of Appeals, Seventh Circuit.
April 9, 1946.

Rehearing Denied May 16, 1946.

EVANS, Circuit Judge, dissenting.

Alvin Glen Hubbard and Jacob Geffs, both of Chicago, Ill., and Mortimer H. Camp, of New Britain, Conn., for appellant.

Franklin D. Trueblood, of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This appeal is from a judgment in favor of the plaintiff in the sum of $95,000, entered January 12, 1945. The judgment, predicated upon the verdict of a jury, was for compensation alleged to be due and owing the plaintiff under a contract of employment for services rendered during a part of 1941 and 1942.

The errors urged for reversal in the main are directed at the court's charge to the jury. Other errors asserted are that the award of compensation to plaintiff was contrary to the statute and public policy, that plaintiff failed to prove performance under the contract sued upon, and the admission and exclusion of certain testimony.

Defendant for many years has been engaged in the manufacture and sale of machine tools and parts therefor. In 1923, plaintiff entered into a contract with the defendant by which he became its exclusive sales representative for what was called the "Ohio territory," which included certain designated counties in Ohio and Indiana. This territory was subsequently enlarged to include certain counties in Pennsylvania and Kentucky. As compensation for his services, defendant agreed to pay plaintiff a salary of $5,000 per year, his traveling expenses, and a commission of $1\frac{1}{4}\%$ on all sales orders sent in from his territory and accepted at defendant's home office after a minimum annual volume of $200,000 had been reached. This initial contract of employment, insofar as it pertains to plaintiff's compensation and the territory assigned to him, was reduced to writing in the form of letters and telegrams.

Plaintiff acted and represented defendant in the capacity related under the 1923 contract without change until 1935. In the latter year plaintiff's compensation was changed, as is evidenced by defendant's letter dated January 8, 1935. In this letter, among other things, it is stated:

"In compensation for your work, we are to pay you on a monthly basis at the rate of $3,600.00 a year, but it is to be definitely understood that our arrangement with you is on a month to month basis.

"In addition to your salary at the above rate, we will pay you a commission of $1\frac{1}{4}\%$ on all billings into your territory in excess of $100,000.00."

In 1938, plaintiff's base salary of $5,000 per year was restored, as is evidenced by defendant's letter dated March 24 of that year. By the terms of this letter plaintiff's commission remained unchanged. Plaintiff continued his employment, rendered services as he had theretofore done, and was compensated according to the terms of the 1938 letter until early in 1941, when certain events occurred which gave rise to this law suit.

On March 14, 1941, plaintiff at his home in Cleveland, Ohio, was called by telephone from Washington by Mr. Steinle, defendant's vice president and sales manager, who requested plaintiff to come to Washington and serve on the Army and Navy Munitions Board. Plaintiff, because of his health and the unfavorable Washington climate, expressed an unwillingness to do so. Steinle was insistent and made an appointment to meet him in Cleveland. This meeting was had and plaintiff handed Steinle his written resignation dated March 29, 1941, effective April 1 of that year. Upon reading the same, Steinle tore it in pieces and insisted that plaintiff accept the assignment. Plaintiff reluctantly agreed. Shortly thereafter plaintiff left for Washington by way of New Britain, Connecticut (defendant's home office), where he tried to persuade Mr. Pease, defendant's president, to relieve him of the assignment. Pease, as Steinle had theretofore done, emphasized the importance of plaintiff's acceptance of the assignment because of the war situation with which the country was faced.

We find no serious dispute between the testimony of plaintiff on the one hand and Steinle and Pease on the other as to the representations which were made to plaintiff in order to persuade him to take the Washington assignment. In short, plaintiff was promised as an inducement for his acceptance that he would not be penalized in any way, that the defendant would treat him the same as though he remained

in the Ohio territory and would continue the payment of his commissions the same as before, subject to any change in management policy of the defendant. It was admitted by Steinle that plaintiff would have been subject to a change in management policy had he remained within the confines of the Ohio territory. There is no room for doubt but that plaintiff understood and was promised by defendant that the agreement as to compensation then existing between the parties was to remain unchanged upon his acceptance of the Washington assignment.

Plaintiff moved from the Ohio territory to Washington, D. C., and became a technical consultant to the Army and Navy Munitions Board on April 1, 1941. He served on that Board as a Dollar a Year man until May, 1942, when, at defendant's request, he returned to New Britain and worked for about six weeks on defendant's Order Board. On June 15, 1942, plaintiff, at the suggestion of the defendant and over plaintiff's protest, again returned to Washington where he became a consultant to the War Production Board. He served in this capacity until January 1, 1943. During all the time plaintiff was in Washington he continued to serve defendant in the Ohio territory by correspondence, telephone, telegram and occasional visits to the territory. He maintained an office in Washington on behalf of the defendant and was held out to the public as its representative in the Ohio territory. Defendant had other representatives in the territory who submitted daily reports to its home office just as plaintiff had done prior to his going to Washington, copies of which were mailed to the plaintiff in Washington until about the middle of 1942.

It is not disputed but that defendant continued to pay plaintiff his regular salary of $5,000 per year throughout 1941 and 1942, his expenses, except those incurred in government business which were paid by the government, just as it had done prior to his going to Washington. They also paid him commissions until late in 1941, in accordance with the reports of sales made in the Ohio territory. Payment of salary was usually made on a four weeks' basis, that is, thirteen payments per annum. Commissions were paid in a similar fashion except no commissions were paid during a year until sales in the territory exceeded $100,000. Plaintiff on numerous occasions in the fore part of 1942

requested payment of his commissions. On September 13, 1942, defendant tendered plaintiff a written contract for the year 1942, which provided among other things for a "ceiling" of $15,000 on his 1942 commissions. Plaintiff by letter refused the terms proposed, stating, "The terms you mention are not according to our arrangement." Other correspondence followed which evidenced the continuing demand of plaintiff for payment and the refusal of defendant to pay. Defendant by its letter of December 16, 1942, asserted in effect that plaintiff was bound by an oral agreement entered into early in January, 1942, as a basis for a yearly contract. Plaintiff was also notified in this letter that his contract of employment was terminated as of December 31, 1942, and a check for $15,000 was tendered plaintiff as payment in full for commissions for the year 1942, which plaintiff refused to accept.

Insofar as the facts are concerned, defendant's main and perhaps sole defense was that plaintiff's employment contract was modified or rescinded in the early part of January, 1942. The issue having been decided by the jury adversely to the defendant and there being no contention but that the jury's determination is supported by substantial evidence, there would under such circumstances ordinarily be no occasion for this court to discuss the evidence pertaining to such issue. However, the facts concerning defendant's contention that the contract was modified or rescinded are so closely related to the criticism directed at some of the court's instructions that it appears appropriate to consider them at this point.

Defendant's contention that the contract was rescinded or modified is predicated upon a conversation which Steinle claims to have had with the plaintiff on January 8, 1942, in a hotel room in Washington. He asserts in that conversation plaintiff was told that defendant would pay him for the year 1941 a total of $25,000 (including salary and commissions) and $20,000 (salary and commissions) for 1942, and that plaintiff accepted and agreed to the proposition. Plaintiff denied that any such conversation took place at any time or that any agreement was ever made reducing or limiting the defendant's contract liability. Steinle admits that his alleged oral agreement with plaintiff was to be reduced to writing. So far as the record discloses, however, no effort was made to do so until

September 13, 1942, when plaintiff had submitted to him a proposed written contract effective as of January 1, 1942, providing for a salary of $5,000 per year and a maximum commission of $15,000. This proposed contract made no reference to the alleged oral agreement of January 8, 1942. Plaintiff refused to become a party thereto.

Defendant's letter of December 16, 1942, to plaintiff among other things stated, "We certainly have understood all this year that your compensation ceiling was $20,000, and have always offered payment on that basis * * *." Thus it becomes plain from this letter, as well as from the proposed contract of September 13, 1942, which provided a maximum commission of $15,000, that the alleged agreement of January 8, 1942 was not an outright offer to plaintiff of compensation in the amount of $20,000 for 1942 ($5,000 salary and $15,000 commission), as defendant now contends, but that it was the purpose and intent to fix a "ceiling" upon plaintiff's commissions for that year.

Plaintiff asserts that the alleged modification of January 8, 1942 was void as a matter of law and that he was entitled to a directed verdict. It is argued that the modification was (1) without consideration, (2) barred by the statute of frauds, and (3) dependent upon a written agreement to be subsequently executed. In view of the fact that plaintiff obtained a verdict at the hands of the jury, no good purpose could be served in deciding whether he was entitled to a directed verdict. True, some of the reasons argued in favor of a directed verdict, particularly that the alleged modification was without consideration, are material in view of the criticism directed at certain of the court's instructions. They will be considered subsequently in connection with our treatment of the instructions.

This brings us to a consideration of the instructions concerning which the defendant complains at length. We quote the third instruction because much of the criticism directed to it is applicable to other instructions. It follows:

"You are further instructed that the burden is upon the defendant to establish the alleged rescission of the written contract, Exhibit A (letter of March 24, 1938), by clear, positive and convincing evidence, and unless you find that the defendant has so established each and every element of said alleged oral contract of rescission, you will return a verdict for the plaintiff in the full amount demanded."

■ It is argued that this instruction directs a verdict and that it is fatally defective because it does not contain all the elements necessary to permit a recovery by plaintiff. The main criticism in this respect is that it omits the matter of performance on the part of plaintiff. One answer to this criticism is that the court's instructions must be considered as a whole, and in other instructions the jury were told that the plaintiff in order to recover must prove substantial performance as defendant's representative in the Ohio territory. A more potent answer, however, so we think, is that plaintiff's performance was not an issue in the case. It is indisputable that he performed in the manner and to the extent required by the defendant. The fact that his performance after he left the territory and went to Washington was of a changed character is irrelevant for the reason that plaintiff not only went to Washington under a virtual command from the defendant with an agreement that his pay status with defendant would remain unchanged, but he was held out and continually recognized by defendant as its sales representative and he performed under its direction, admittedly in a satisfactory manner. See Chesapeake & Ohio Canal Co. v. Ray, 101 U.S. 522, 525, 25 L.Ed. 792, and 13 C.J. 673. See also 17 C.J.S., Contracts, § 494.

■ The instruction is also criticized because it refers to the letter of March 24, 1938, as a written contract. Defendant contends, perhaps for the purpose of escaping the statute of frauds, that the contract sued upon was oral and therefore it was prejudicial for the court to refer to it as written. We do not think the contract was oral; in fact, there can be little doubt but that the parties had a written contract as to plaintiff's compensation from the beginning of his employment in 1923 until he was finally discharged. Defendant in its brief, after noting the correspondence and telegrams exchanged by the parties at the time of plaintiff's original employment, states: "Without change in the above contract plaintiff continued to work for defendant until December, 1935." True, as already pointed out, the contract as to plaintiff's compensation was twice changed, first in 1935 and later in 1938. In both instances such changes were reduced

to writing in the form of letters from defendant to the plaintiff. We are unable to discern how these changes thus reduced to writing converted what had theretofore been a written agreement into one which was oral. Moreover, the case was tried upon the theory that a written contract was involved. Early in the trial, when plaintiff was asked to state his agreement with defendant, the latter's counsel objected to oral testimony for the reason that the agreement "is in the form of correspondence, it is written." The record leaves no room for doubt but that the parties recognized and proceeded upon the theory that plaintiff's claim was predicated upon a written agreement. It is now too late for defendant to seriously contend otherwise. It perhaps would have been more accurate to have referred merely to the written contract without limiting it to the letter of March 24, 1938, because this letter was in fact only a modification of the contract then existing. However, this defect, if such it be, obviously did not confuse the issue or prejudice the defendant.

■ The instruction is also criticized because it requires that the alleged rescission of the written contract be established "by clear, positive and convincing evidence." This criticism is based upon defendant's contention that the contract was oral and that its rescission could be shown by a preponderance of the evidence. The contract being in writing, however, the degree of proof required by the instruction was proper. See 6 R.C.L. page 922; Peck v. Stafford Flour Mills Co., 6 Cir., 289 F. 43, 45; Selman .v. Geary, 334 Ill. 642, 650, 166 N.E. 455.

What we have said as to the criticism directed at the third instruction is largely applicable to that directed at the fifth, sixth and ninth instructions which, it is alleged, direct a verdict. They all refer to the letter of March 24, 1938, as the written contract between the parties and omit the element of performance on the part of the plaintiff. It is unnecessary to discuss further these alleged errors.

■ Defendant also contends that the second instruction was erroneous as being argumentative and containing abstract propositions of law. It perhaps is subject to this criticism but we do not think it is unintelligible, as defendant asserts. Without relating it in detail, it informed the jury in substance that the alleged conversation of January 8, 1942 was not bind-ing upon the parties unless their minds met on all the essential terms and conditions about which they were contracting, that they intended to be bound without reducing the agreement to writing, and that the agreement was not binding without a consideration inuring to the plaintiff. We see nothing wrong with this general statement of contract law. In fact, it was quite favorable to the defendant in that it submitted to the jury the question as to whether there was any consideration for the agreement, which we think might properly have been decided against the defendant as a matter of law. As already noted, plaintiff in his motion for a directed verdict assigned lack of consideration as one of the reasons therefor. It is difficult to discern any consideration which flowed to the plaintiff as the result of the alleged oral agreement of January 8, 1942. Considering the situation in this respect most favorable to the defendant, plaintiff, in addition to his salary of $5,000 per annum, was offered $20,000 commissions for the year 1941, and a maximum of $15,000 in commissions for 1942. Plaintiff at that time had already earned and had owing to him more commissions than those offered him for the year 1941, and for 1942 he had a contract for commissions without any maximum limit. Thus plaintiff for one year was offered less than he was otherwise entitled to, and for the other year a maximum amount was substituted for an existing agreement which contained no maximum.

The statement most criticized in the instruction now under discussion is:

"The defendant on January 8, 1942 had no legal right to demand that plaintiff release it from its obligation under the written contract, Exhibit A, nor to compel plaintiff to accept a less sum by way of compensation than that provided for in said Exhibit A."

■ The validity of this statement depends upon whether the contract of employment was upon a monthly or a yearly basis. Defendant now asserts that it was the former and places its reliance upon a statement contained in its letter of January 8, 1935, "that our arrangement with you is on a month to month basis." True, the 1938 letter made no reference in this respect and defendant contends that the provision of the 1935 letter is controlling. This situation on its face appears to support the defendant's position, but again de-

fendant asserted no such position in the trial court. The parties both before and at the trial treated plaintiff's contract on a yearly and not a monthly basis. At the trial, defendant's president stated, "Every contract was on a yearly basis." Defendant's counsel, in response to an inquiry from the court regarding the contract, stated, "Yes, unless they change it, they go on next year; it continues the next year." Further, defendant appears to have recognized the contract as yearly because in its December letter of 1942 it discharged plaintiff effective December 31, 1942. We think the construction which the parties placed upon the contract in this respect is controlling. It being on a yearly basis, we see no harm in telling the jury that defendant on January 8, 1942 was without power to compel plaintiff to accept a modification of his contract during that year.

The court by its eighth instruction told the jury:

"You are also instructed that the parties have entered into a stipulation respecting proof of damages, which stipulation, together with certain exhibits attached thereto, being Stipulation Exhibits X–1, X–2, X–3, X–4, X–5, X–6 and X–7. * * *"

■ The stipulation mentioned in this instruction in connection with the exhibits thereto attached disclosed what was shown by defendant's records as to (a) the total volume of sales in 1941 on orders accepted from the Ohio territory, and (b) the amount of such sales for 1942, including those shipped and billed in 1943. The main criticism of this instruction is that it permitted plaintiff to recover on orders from the Ohio territory accepted by defendant in 1942 but not actually billed until 1943, subsequent to termination of plaintiff's contract. The amount recovered as commissions upon these latter orders is substantial and perhaps presents the most serious question raised upon this appeal. At the commencement of plaintiff's employment in 1923, defendant in its letter of September 15 of that year agreed to pay a "commission of 1¼% on all sales in excess of $200,000 per year. As previously advised we will credit shipments of all orders received subsequent to your connection with us, to your sales." We think a fair construction of this language is that plaintiff's commissions were earned when orders were received by the defendant for sales theretofore made.

■ Again, the agreement was thus construed by the parties and plaintiff's commissions during all the years were recognized as earned at the time the orders were accepted, but they were not generally calculated until the orders were billed for the reason that the price of an article was not always determined until that time. Defendant, however, relies strongly upon a statement in its letter of March 24, 1938, "In addition to this salary, we will pay you at the rate of 1¼% for all billings in excess of $100,000.00." It is argued that by reason of this statement plaintiff's commission was not earned until the billing took place. Plaintiff's construction of this provision is that it made no change in the agreement theretofore existing as to when the commission was earned but it merely deferred the time when the commission was payable, that is, when the goods were billed. We think plaintiff's interpretation of this provision is more reasonable than that of the defendant. In this connection, it is again pertinent to note that reports of sales in the Ohio territory were made to the plaintiff each four weeks, including the time involved in this suit. If defendant thought plaintiff was entitled to commissions only upon billings, it would seem that the reports would have been based thereon rather than upon sales. We find no explanation in the record as to why the reports were thus made except that defendant recognized commissions were earned when sales were made and accepted by the defendant.

■ We are of the view that unless there is an agreement clearly providing to the contrary, a person selling on a commission basis is entitled to commission when a sale is made, irrespective of when shipment takes place. "In the case of a salesman working on a commission basis, it is reasonable to assume that his compensation has been earned when he has procured the customer's orders although he does not complete his term of employment." 4 Williston on Contracts (Rev. Ed.), Sec. 1030. See also Ohio Marble Co. v. Byrd, 6 Cir., 65 F.2d 98, 100, and Groome v. Freyn Co., 374 Ill. 113, 128, 28 N.E.2d 274. We therefore are of the view that the eighth instruction was not erroneous. We have discussed what we regard as the most important criticism concerning the instructions. Certain other criticism of less importance has been noted. We find nothing in the court's charge to the jury which would require a reversal; in fact, we think the charge was as fair

902

to the defendant as could reasonably be expected.

■ Defendant also urges that the judgment should be reversed, asserting that the contract sued upon is illegal and void because in violation of certain provisions of the United States statutes. The sections relied upon are 41 (18 U.S.C.A. § 93) and 112 (18 U.S.C.A. § 202) of the Criminal Code, and 5 U.S.C.A. § 66. Defendant's theory that the contract is violative of the statutory provisions referred to is and must be predicated upon the premise that the sales upon which plaintiff claims commissions and has recovered a judgment were made to the government. To establish such premise defendant relies upon a stipulation to which were attached certain exhibits (heretofore referred to in connection with the court's charge to the jury) and certain other exhibits, the admission of which was denied, which purported to be contracts between the defendant and the government. It is true that these exhibits, both those admitted in connection with the stipulation and those offered by the defendant, when considered alone lend colorable support to the defendant's theory. The exhibits admitted in connection with the stipulation in accordance with the terms thereof merely reflect what was shown by defendant's books as to the orders upon which plaintiff claimed commissions. Generally such exhibits show the name of the individual customer, the number of the contract, the purchase price, the date shipped, and that payment was made by D. P. C. (Defense Plant Corporation). The information thus contained in these exhibits appears to be contradictory in that they show the customer to be someone other than the government but at the same time disclose that the order was paid for by the latter. This inconsistency, however, is apparent rather than real, as the testimony unquestionably discloses that the government was not the actual purchaser.

Briefly, the government prior to the war, to assist in the financing of the increased production of machine tools as well as to safeguard the manufacturers against loss in the event the national emergency should unexpectedly end, through the Defense Plant Corporation agreed to advance a certain portion of the selling price of the machine tools to be manufactured. To secure the repayment of these advances, as well as to enable the government through its system of priorities to control the allocation of these machines to private manufacturers on the basis of critical necessities, a series of blanket or pool contracts was entered into between the government and such manufacturers, including the defendant. These contracts were the ones offered in evidence by the defendant, which the court refused to admit. Without entering into any detailed discussion of defendant's unrealistic theory, we think it is sufficient to observe generally that the defendant sold its machines in the Ohio territory to private war industries in the same manner as it had theretofore done, with the qualification, of course, that it was required by the government to observe certain orders and regulations as to priorities and selling prices. The government, in order to obtain maximum production and to give the manufacturers some assurance against loss, advanced a certain portion of the purchase price. The record discloses that when the orders were billed to these individual purchasers, defendant collected the purchase price and reimbursed the government for any money it had advanced. Defendant's president testified that the government had been reimbursed for all money advanced by it on sales made by the defendant in the Ohio territory, on which plaintiff claimed commissions.

The fact that defendant's books indicated that the purchase price was paid by the government becomes insignificant in the face of what actually transpired. It is plain that the government never became the actual owner of the machine tools unless it be in the highly technical sense that it acquired some claim or title because of the money it had advanced. The chief concern of the government was to make certain that the tools would be produced and that they would be placed where they were most needed in support of the war effort.

No case is cited and we find none which supports defendant's theory that the contract sued upon was in violation of the statutory provisions referred to. Neither do we think that the allowance of plaintiff's claim is contrary to public policy. See Muschany v. United States, 324 U.S. 49, 65 S.Ct. 442; Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112, 83 A.L.R. 1168; United States v. Grace Evangelical Church, 7 Cir., 132 F.2d 460.

Moreover, this defense appears to have been an afterthought as it was not pleaded until by amendment filed a year subsequent

to the original answer. Furthermore, plaintiff was paid his base salary of $5,-000 for each of the years in dispute and $20,000 on account of commissions earned in 1941. Public policy is no more affected in paying the plaintiff the balance due on the contract than it was when defendant voluntarily paid him in part. It should also be kept in mind that plaintiff's employment was of long duration prior to the years in question and that his altered status during those years was largely of defendant's creation. Plaintiff's service to the government was rendered without consideration (except nominal) by it. Such service was in reality a contribution to the war effort by both the defendant and plaintiff and, while praiseworthy, furnishes no reason why plaintiff should not be compensated by the defendant in accordance with its agreement with him. It is also pertinent to observe that there is not even an intimation that either defendant or plaintiff received any financial benefit or that the government suffered any loss because of plaintiff's presence in Washington. Defendant's president testified that plaintiff was one of the company's best salesmen, that no fault was ever found with the manner in which he performed his work, that in his opinion plaintiff would not have intentionally done anything unethical or improper in his relations with the government, and that it was perfectly proper for him to go to Washington as he did and remain in the employ of the defendant company.

■ Defendant's complaint concerning the court's rulings on the admission of evidence is twofold, both of which may be disposed of in short order. One complaint is directed at the court's refusal to admit certain agreements entered into between the government and the defendant, which were offered, as we understand, for the purpose of showing that the defendant's sales, upon which plaintiff claimed commissions, were made to the government rather than to individuals. (We have heretofore referred to these exhibits.) We have examined these proffered exhibits and are of the opinion that they neither prove nor tend to prove that for which they were offered. We think their admission was properly denied.

■ The other criticism concerns the court's refusal to allow the defendant to cross-examine the plaintiff as to his earnings prior to the years in question, as well as the court's denial of the same character of testimony offered by the defendant. If the recovery sought by plaintiff had been for the reasonable value of his services, we can see how this testimony might have been material. No such recovery, however, was sought by the plaintiff. His claim was predicated solely upon the terms of a contract. This being so, we are of the view that the compensation which he had received under the contract prior to the years in question was immaterial and that it was properly excluded.

■ We also have before us defendant's contention, presented rather feebly as well as tardily, that the court committed error in refusing to admit certain exhibits relied upon as showing that the contracts upon which plaintiff's commissions were based had been or were subject to renegotiation. This defense was pleaded by the defendant in its answer, and while it was designated as one of the contested issues before this court, it was not mentioned by the defendant in its argument either in its original or reply brief. The question, however, was raised during oral argument and the parties given leave to file supplemental memoranda on this particular question. It is not unfair to state that counsel have supplied very little light in its solution. Plaintiff devotes most of his memorandum in an attempt to show that the defense has been abandoned by pointing out that defendant, over the objection of the plaintiff, was excused from printing the exhibits pertaining to this defense. We think this contention is without merit. It is not unusual that parties are excused from printing exhibits, especially where they are long and complicated, as in the instant matter.

■ The so-called Renegotiation Act relied upon became effective April 28, 1942, Title 50 U.S.C.A.Appendix § 1191. A study of this Act without the aid of other authority leads us to the conclusion that the defense is without merit and that the exhibits were properly excluded. Paragraph (a) (3) provides that the terms "renegotiate" and "renegotiation" include "the amount of any excessive profits." The next paragraph defines the term "excessive profits" as meaning that portion of the profits "determined in accordance with this section to be excessive." The paragraph then provides a formula or the factors to be taken into consideration in determining excess profits. The next paragraph pro-

vides: "The term 'profits derived from contracts * * *' means the excess of the amount received or accrued under such contracts * *, * over the costs paid or incurred with respect thereto." Then follows a formula for calculating such costs.

Without any light except what we glean from this enactment, it appears that the term "renegotiation" is directed solely at excess profits and not at reducing the price at which the article or product has been sold. As we understand, excess profits subject to renegotiation are those profits in excess of all the legitimate costs incurred in production, plus a normal profit, all of which are to be determined in accordance with designated formulas. If we are correct in this view, defendant was entitled to list as an item of its cost of production the amount paid to the plaintiff or owed to the plaintiff by reason of its contract with him.[1]

In other words, defendant's obligation to the plaintiff should have been taken into consideration in determining any excess profits subject to renegotiation. Instead, it contends that its excess profits must be renegotiated before it can determine its selling price upon which plaintiff's commissions were calculated. This argument, so we think, places the cart before the horse. As heretofore shown, plaintiff's commissions were predicated upon a sales price determined by the defendant either at the time of or prior to billing, and we are of the opinion that a renegotiation of excess profits at some subsequent time would not alter this base thus fixed by the defendant.

Subsequent to the trial and during the pendency of defendant's motion for a new trial, plaintiff by amendment to his complaint pleaded that defendant was estopped to dispute performance. The amendment was offered purportedly in compliance with Rule 15(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Defendant now contends that it was entitled to take issue with this amended pleading and to have a trial thereon.

In the first place, we are of the view that this amended pleading was unnecessary because, as heretofore shown, plaintiff performed under the contract in the manner required and directed by the defendant. We think this was sufficient and that it was unnecessary for him to rely upon defendant's acts and conduct as constituting an estoppel. Secondly, assuming that it was necessary, the issue of estoppel was raised on numerous occasions during the trial. Particularly is this shown by the colloquy between the court and counsel which occurred at the conclusion of plaintiff's case on defendant's motion for a directed verdict. One of the reasons asserted in support of such motion was that plaintiff had failed to prove performance. At that time plaintiff's counsel asserted that defendant was estopped to deny performance. Defendant contended that estoppel could not be relied upon as it had not been pleaded. The court in overruling the motion for a directed verdict pointed out that under the rules plaintiff's pleadings could be amended to conform to the testimony.

With this state of the record defendant certainly is in no position to claim it was surprised by the amended pleading, and we see no reason why any further proof which it had relative to such issue could not have been offered in the course of the trial. We think there was no error in permitting the amendment and in denying defendant the right to a further trial on such issue.

The judgment is affirmed.

EVANS, Circuit Judge (dissenting).

I find myself forced to dissent because influenced by certain facts which stand out in such bold relief as to make it impossible for me to ignore them.

Briefly stated, plaintiff, a salesman for defendant, a manufacturer of tools, found himself called to Washington at the beginning of the war to become a Government Dollar-A-Year man, a position he accepted reluctantly.

He was a $5,000.00 a year man—a good salesman, with an established territory. He had a plus commission clause in his salary contract. He became a Dollar-A-Year Government employee and his compensation through commissions from defendant jumped from $5,000 to $85,000 a year— largely, if not entirely, through sales by

---

[1] In this connection, we note that one of the renegotiation exhibits lists plaintiff's salary in the amount of $20,000.00 for the year 1942 "as an item of expense." True, that was the amount which defendant owed him, according to its theory, but the point is that it could, so far as we know, with equal propriety have listed the correct amount.

defendant to the Government or to war industries whose tool purchases were paid for or guaranteed by the U. S. Government.

Now, just what a Dollar-A-Year Government job means is not entirely clear—at least to me. I shall assume that the old rule that one can not serve two masters who are dealing at arms' length with one another, applies, unless, of course, it is shown that his double employment was known to and acquiesced in by both parties. The question naturally arises: Who did plaintiff represent when it came to recommending for purchase tools to the Government such as defendant made?

I can not believe that any rule of law would be a safe or sound one which would permit a Dollar-A-Year man to represent the Government and at the same time represent a private company which would pay him a commission for the sale of its goods to said Government. It would be against public policy to permit of such an arrangement.

And it would be the same whether the goods were sold to the Government or to a war industry working for the Government for which the Government is guaranteeing purchase payments. It is the position the Dollar-A-Year man finds himself in, which provides the basis for the rule we must invoke and apply. It may seem like a harsh rule in some cases. Doubtless there are cases where it is harsh. Yet it is the only safe rule to apply, to hold that the Dollar-A-Year man, like any other agent or employee, can not profit by his position, through sales made to the Government, or its agents, upon which he receives a commission.

Now, the trouble element in this case is not with the rule, but with its application to the facts disclosed. Both plaintiff and defendant say that plaintiff never had any occasion as a Dollar-A-Year man to influence the purchase of defendant-made tools by the Government. He was an expert on such tools. That is why he was chosen. Both defendant and plaintiff belittle the inquiry as to what were his duties. It seems to me there was an avoidance of inquiry rather than a real effort to ascertain what he did.

I quote briefly from the record.

"Q. You had a desk there with them, didn't you, in the Army and Navy Munitions Board?

"A. After I was there for several months, I had a desk in one of the offices; yes.

"Q. And did they consult you about where these machine tools would be available?

"A. Sometimes they would, yes.

"Q. Then, what was your office with the War Production Board?

"A. I didn't have an office in the War Production Board.

"Q. Well, I mean what was your job with the War Production Board?

"A. Technical adviser, was the title.

"Q. What were your duties with the War Production Board?

"A. To check second-hand machines, to see if they would be suitable or capable of manufacturing critical parts that the priority division were anxious to get.

"Q. Now, the Army and Navy Munitions Board recommended to the Defense Plant Corporation contracts for machine tools, did it not?

\*       \*       \*       \*       \*

"A. Yes.

"Mr. Jeffs: Q. And the War Production Board also made recommendations to the Defense Plant Corporation as to the purchase of machines?

"A. Yes.

"Q. Did you have anything to do with the recommendations for the purchases of machines?

"A. No.

"Q. Pardon me; your recommendations, you said, were made by the Army and Navy Munitions Board, and the War Production Board?

"A. I had nothing to do with them individually.

"Q. And did you have anything at all to do, ever, with the purchasing of the product of companies like the defendant company by any instrumentality or agency of the Government, or the Government itself?

"A. At no time did I have anything to do with it."

Defendant's witness testified:

"I told him that while he was in the employ of the Government he would have to be particularly careful and not to do anything that would have any bearing on the New Britain Machine Company; that he could not do anything that would in-

fluence a customer to buy machines of the New Britain Machine Company; that he could not do anything to influence, through his position with the Army and Navy Munitions Board, the Army and Navy Munitions Board recommending pool orders for our machines; * * *

"A. I told him that his duties with regard to the Ohio territory could not remain the same. He could not perform his duties, the required duties in the Ohio territory, while he was on the job at Washington; it would be just impossible to do it.

"I further told him at that time he was in no way to solicit business for the New Britain Machine Company while he was in Washington on that job; further, that he was to do nothing while on that job which would smack of favor to the New Britain Machine Company. * * * He was instructed not to solicit any business for the New Britain Machine Company and he was instructed to not do anything in regard to running the Ohio territory."

The following facts stand out: Defendant's business greatly increased. Its increase in sales was of tools upon which plaintiff here claims a commission. Said increased business was in sales made by defendant to the United States Government or to a war industry, the cost of which tools was paid by or guaranteed by the United States. When these sales were made, plaintiff was the Government adviser on what kind of tools were suitable and proper. Upon his advice the Government relied and acted, in part at least.

Our question: Is it consistent with sound public policy to permit one situated as was plaintiff to receive a commission from a manufacturer on sales made to the Government? I think it is not. Even though plaintiff refrained from exercising influence in the sale, even though he made an heroic effort and perhaps succeeded in closing his eyes to the effect of his selection of tools, on the sales of defendant, the commission contract should not be permitted. Its enforcement must be denied.

To hold otherwise would, be to reward efforts to swell the war costs and pass them on to the Government. Moreover, I think the rule which prevents one from accepting pay from two masters should be invoked and applied most strictly and without restriction when it comes to dealings wherein the Government is involved— that is, when the Government must foot the bills upon which, as in this case, an excessive profit is made.

No exception to the rule can be safely invoked which permits the plaintiff, a Dollar-A-Year man, to receive a commission from the manufacturer of goods where he had anything to do with the choice, or with recommending the make or kind of goods sold to the Government. His commission made it impossible for him to act neutrally in the matter. In fact, it bars him from acting at all. In fact, I can see no justification for the Dollar-A-Year Government employees. Nor can I see why the defendant sought employment for its salesman, or why the salesman accepted the employment, save as they expected to profit thereby. The proper way in my opinion was for the Government to draft its experts like it did its soldiers and sailors, pay them a salary, prohibit commission contracts on sales made to the Government.

There is another point which is somewhat novel.

Defendant testified that the written contract was modified by a parol agreement which limited plaintiff's compensation to $25,000 for one year and to $20,000 for the second year. This testimony was disputed by the plaintiff. The jury found for the plaintiff, and we would ordinarily hold that this closed the dispute so far as this fact issue is concerned. But the jury reached its verdict on a charge which dealt specifically with this issue, and more particularly with the consideration for such modified agreement.

In its instructions on this phase of the case, the court said:

"The jury are instructed that even if you find from the evidence that the conversation alleged to have taken place on January 8, 1942, between the plaintiff and the witness Steinle was in fact had, the same will not be binding upon the plaintiff unless * * * the plaintiff received a valuable consideration from the defendant which induced him to make the alleged oral agreement, as a naked promise is void on general principles of law. The defendant on January 8, 1942, had no legal right to demand that plaintiff release it from its obligation under the written contract, Exhibit A, nor to compel plaintiff to accept a less sum by way of compensation than that provided for in said Exhibit A. * * *"

The charge was clear and explicit. Was it correct as to the necessity of a valid consideration to support the modified agreement? Here again a somewhat new ques-

tion arises out of the unusual war status. Perhaps it could be said it also involves ethics in time of war.

Of course a consideration is necessary to make a valid contract or to modify an existing valid contract. Unless there is such consideration, the modification is not effective.

What then, is a valid consideration in war times? Specifically, is patriotic action a sufficient consideration? May A, who has a contract with B, change the contract with no consideration therefor other than a patriotic desire to win the war? To be still more specific, may not plaintiff who had a contract calling for a commission on sales of articles essential to carrying on the war, agree with his employer to accept a lesser commission or forego the commission feature altogether, because he wants to see his country win the war or desires to serve his country as a Dollar-A-Year employee?.

I think this is a sufficient consideration. Moreover, I think elimination of the commission feature was the only course which plaintiff could pursue and honorably discharge a duty as a Government Dollar-A-Year man. He simply had to get away from the commission feature of his contract.

Under the charge as given the jury could not have found a valid modification of the original agreement because of the charge on the lack of a valid consideration.